518 F.2d 1014
 AMERICAN MINI THEATRES, INC., a Michigan Corporation, and
Pussycat Theatres of Michigan, a Michigan
Corporation, Plaintiffs-Appellants,
v.
Roman GRIBBS, Mayor of the City of Detroit, et al.,
Defendants-Appellees.
NORTOWN THEATRE INC., Plaintiff-Appellant,
v.
Roman GRIBBS, Mayor of the City of Detroit, et al.,
Defendants-Appellees.
 Nos. 74-2129, 74-2303.
 United States Court of Appeals,
Sixth Circuit.
 June 16, 1975.
 
 Stephen M. Taylor, Taylor & Rubin, Detroit, Mich., for plaintiffs-appellants.
 Maureen P. Reilly, Michael M. Glusac, Detroit Corp. Counsel, Elliott S. Hall, John E. Cross, John F. Hathaway, Asst. Corp. Counsels, Detroit, Mich., for defendants-appellees.
 Before EDWARDS, CELEBREZZE and LIVELY, Circuit Judges.
 LIVELY, Circuit Judge.
 
 
 1
 This case deals with a city zoning ordinance which classifies and regulates "adult" movie theatres and bookstores solely on the basis of the content of the materials which they purvey. Except for one feature the zoning ordinance and a related code amendment were held valid by the district court as against charges that they violate the First and Fourteenth Amendments to the Constitution. We reverse.
 
 
 2
 In 1962 the City of Detroit adopted an Official Zoning Ordinance which contained a finding that concentrations of certain types of businesses tended to have a deleterious effect upon the neighborhoods in which such concentrations took place. By section 66.0000 of that ordinance it was provided that not more than one of any such businesses might be placed within 1,000 feet of any other business establishment of a kind listed in the section. The businesses thus regulated were bars, transient hotels, poolrooms and similar establishments found in "skid row" areas of many cities. Whereas the purpose of most zoning ordinances is to establish separate zones for various uses and to confine such uses to those zones, thus segregating specified uses of land from each other and concentrating each use or class of uses into defined zones, Detroit adopted the theory of "inverse zoning" by which certain land uses were prohibited from concentrating and were required to maintain minimum distances from each other. Of course, all of the uses thus regulated were also subject to the general zoning features of the ordinance which limited them to commercial and industrial zones.
 
 
 3
 Prior to 1972 the authorities noted the emergence of clusters of "adult" movie theatres and bookstores together with topless bars and "go go" establishments in certain areas of the City. In an attempt to control these concentrations of adult-type entertainment, the City adopted a series of amendments to the Official Zoning Ordinance and the City Code by ordinance 742-G and 743-G, both of which were made effective November 2, 1972. Ordinance 742-G, inter alia, added new sections 32.0007, 66.0000 and 66.0103, which are reproduced in part as follows:
 
 Section 32.0007 Adult:
 Adult Book Store
 
 4
 An establishment having as a substantial or significant portion of its stock in trade, books, magazines, and other periodicals which are distinguished or characterized by their emphasis on matter depicting, describing or relating to "Specified Sexual Activities" or "Specified Anatomical Areas," (as defined below), or an establishment with a segment or section devoted to the sale or display of such material.
 
 Adult Motion Picture Theater
 
 5
 An enclosed building with a capacity of 50 or more persons used for presenting material having as a dom-(sic) presenting material distinguished or characterized by an emphasis on matter depicting, describing or relating to "Specified Sexual Activities" or "Specified Anatomical Areas", (as defined below) for observation by patrons therein.
 
 Adult Mini Motion Picture Theater
 
 6
 An enclosed building with a capacity for less than 50 persons used for presenting material distinguished or characterized by an emphasis on matter depicting, describing or relating to "Specified Sexual Activities" or "Specified Anatomical Areas", (as defined below), for observation by patrons therein.
 
 
 7
 For the purposes of this Section, "Specified Sexual Activities" is defined as:
 
 
 8
 1. Human Genitals in a state of sexual stimulation or arousal;
 
 
 9
 2. Acts of human masturbation, sexual intercourse or sodomy;3. Fondling or other erotic touching of human genitals, pubic region, buttock or female breast.
 
 
 10
 And "Specified Anatomical Areas" is defined as:
 
 
 11
 1. Less than completely and opaquely covered: (a) human genitals, pubic region, (b) buttock, and (c) female breast below a point immediately above the top of the areola; and
 
 
 12
 2. Human male genitals in a discernibly turgid state, even if completely and opaquely covered.
 
 
 13
 Section 32.0023 Cabaret.
 
 Group "D" Cabaret
 
 14
 A cabaret which features topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers.
 
 66.0000 Regulated Uses
 
 15
 In the development and execution of this Ordinance, it is recognized that there are some uses which, because of their very nature, are recognized as having serious objectionable operational characteristics, particularly when several of them are concentrated under certain circumstances thereby having a deleterious effect upon the adjacent areas. Special regulation of these uses is necessary to insure that these adverse effects will not contribute to the blighting or downgrading of the surrounding neighborhood. These special regulations are itemized in this section. The primary control or regulation is for the purpose of preventing a concentration of these uses in any one area (i. e. not more than two such uses within one thousand feet of each other which would create such adverse effects). Uses subject to these controls are as follows:
 
 Adult
 
 16
 Adult Book Store Adult Motion Picture Theater Adult Mini Motion Picture Theater
 
 Cabaret
 Group "D" Cabaret
 
 17
 Establishment for the sale of beer or intoxicating liquor for consumption on the premises.
 
 Hotels or motels Pawnshops
 Pool or billiard halls
 Public lodging houses
 Secondhand stores
 Shoeshine parlors
 Taxi dance halls
 Section 66.0103
 
 18
 It shall be unlawful to hereafter establish any Adult Book Store, Adult Motion Picture Theater, Adult Mini Theater or Class "D" Cabaret within 500 feet of any building containing a residential, dwelling or rooming unit. This prohibition may be waived if the person applying for the waiver shall file with the City Plan Commission a petition which indicates approval of the proposed regulated use by 51 per cent of the persons owning, residing or doing business within a radius of 500 feet of the location of the proposed use, the petitioner shall attempt to contact all eligible locations within this radius, and must maintain a list of all addresses at which no contact was made.
 
 
 19
 Ordinance 743-G, an amendment to the Code of the City of Detroit, provides in part:
 
 
 20
 It shall be unlawful for any person to hereafter operate an Adult Motion Picture Theater, Adult Mini Motion Picture Theater or Drive-in Theater until he shall have complied with the requirements of the Official Zoning Ordinance, the provisions of this article and other applicable ordinances of the City of Detroit.
 
 
 21
 This ordinance contains definitions of adult motion picture theatre, by reference to "Specified Sexual Activities" or "Specified Anatomical Areas," using the same language as contained in ordinance 742-G. In addition to specifying the license fees for each of the defined establishments, the ordinance contains the following provision:
 
 
 22
 The Mayor may refuse to issue a license for the operation of any business regulated by this article, and may revoke any license already issued upon proof submitted to him of the violation by an applicant, or licensee, his agent or employee, within the preceding two years, of any criminal statute of the State, or of any ordinance of this city regulating, controlling or in any way relating to the construction, use or operation of any of the establishments included in this article which evidences a flagrant disregard for the safety or welfare of either the patrons, employees, or persons residing or doing business nearby.
 
 
 23
 The plaintiffs-appellants are lessees and operators of "adult" motion picture theatres in the City of Detroit which are directly affected by the two ordinances in question.
 
 
 24
 The Supreme Court held in Euclid v. Ambler Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), that zoning ordinances which classify property by the uses to which it is put and regulate such uses are a proper exercise of the police power. Noting the shift of population in this country to the cities, the Court reasoned that problems connected with police and fire protection, sanitation disposal and other traditional municipal services could be reduced by requiring that various areas of a city be set aside for certain uses and that incompatible uses be prohibited therein. The Euclid zoning ordinance was claimed to be an unreasonable and confiscatory regulation in the guise of exercise of the police power, but the Court held that such laws result from a legitimate exercise of the police power in furtherance of the general welfare and that the legislative judgment must control in setting the classifications and defining the zones. Id. at 388, 47 S.Ct. 114. More recently in Village of Belle Terre v. Boraas, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974), the Supreme Court upheld the validity of a zoning provision which limited a residential area to one-family dwellings and defined the word "family" as "(o)ne or more persons related by blood, adoption, or marriage, living and cooking together as a single housekeeping unit, exclusive of household servants. A number of persons but not exceeding two (2) living and cooking together as a single housekeeping unit though not related by blood, adoption, or marriage shall be deemed to constitute a family." Id. at 2, 94 S.Ct. at 1538. The Court found that the ordinance affected no fundamental rights guaranteed by the Constitution and therefore applied the "rationale relationship" test to the claim that the ordinance violated the equal protection clause of the Fourteenth Amendment. In dissent, Mr. Justice Marshall stated that the ordinance affected the plaintiffs' "fundamental rights of association and privacy guaranteed by the First and Fourteenth Amendments." Id. at 13, 94 S.Ct. at 1543. Thus he would have applied the stricter "compelling interest" test and held the ordinance invalid.
 
 
 25
 There appears to be no disagreement that the power of a municipality to regulate land uses, however desirable and important the goal may be, cannot be achieved by means of laws which deprive affected persons of their constitutional rights. This was the holding in Buchanan v. Warley, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149 (1917), where the Court struck down an ordinance of the City of Louisville which provided that a person of one race could not move into and occupy property in a block where the majority of houses were already occupied by persons of a different race. The Supreme Court did not question the City's claim that the purpose of the ordinance was to promote public peace and prevent conflict and ill will, but held that "this aim cannot be accomplished by laws or ordinances which deny rights created or protected by the federal Constitution." Id. at 81, 38 S.Ct. at 20. Further, in upholding a comprehensive land use plan for the District of Columbia, the Supreme Court noted in Berman v. Parker, 348 U.S. 26, 32, 75 S.Ct. 98, 99 L.Ed. 27 (1954), that although matters of this kind are within the police power of a community, the wide latitude in classifying and limiting property uses which is the province of the legislature is "(s)ubject to specified constitutional limitations."
 
 
 26
 In its brief and oral argument the City of Detroit recognizes that it is regulating matter presumably protected by the First Amendment, but maintains that the ordinances contain no absolute prohibition against dissemination of the First Amendment materials and that the degree of regulation exercised here is permissible under standards enunciated by the Supreme Court. The City filed a number of affidavits by persons trained in the social sciences and experts in real estate values to show that concentrations of adult-type bookstores and theatres would destroy the neighborhood values of the areas in which these concentrations took place. While counter affidavits filed by plaintiffs took issue with the claims that actual property values had declined in areas where these concentrations had taken place, there was nothing offered by the plaintiffs to dispute the statements concerning the decline in "quality of life" and the increase in problems associated with police and fire protection and sanitation brought about by such concentrations. The City of Detroit has demonstrated a compelling and legitimate interest in preserving neighborhood values, aesthetic and social as well as economic. The question is whether ordinances 742-G and 743-G constitute a permissible means of achieving this end.
 
 
 27
 The City maintains that these ordinances represent the only reasonable means of restricting the numbers of regulated uses which may be located in any neighborhood. It is argued that the choice of methods is left to the legislative body of the City, and that it has chosen a method which only indirectly affects the right of free expression guaranteed by the First Amendment. The City relies principally on United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), which upheld a statute making it illegal to mutilate or destroy a draft card. The Court in O'Brien noted that the statute clearly did not abridge free speech on its face and stated that in dealing with conduct containing both "speech" and "nonspeech" elements, " . . . we think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." Id. at 377, 88 S.Ct. at 1679. After discussing the important governmental interest involved in orderly administration of the selective service system, the Court concluded that any effect which the statute had on the right of free speech was incidental and that the defendant had been convicted solely for the "noncommunicative impact of his conduct. . . . " Id. at 382, 88 S.Ct. 1673. Then, as if to make clear the limits of its holding, the Court speaking through Mr. Chief Justice Warren, stated,
 
 
 28
 The case at bar is therefore unlike one where the alleged governmental interest in regulating conduct arises in some measure because the communication allegedly integral to the conduct is itself thought to be harmful. In Stromberg v. California, 283 U.S. 359 (51 S.Ct. 532, 75 L.Ed. 1117) (1931), for example, this Court struck down a statutory phrase which punished people who expressed their "opposition to organized government" by displaying "any flag, badge, banner, or device." Since the statute there was aimed at suppressing communication it could not be sustained as a regulation of noncommunicative conduct. See also, NLRB v. Fruit & Vegetable Packers Union, 377 U.S. 58, 79 (84 S.Ct. 1063, 1074, 12 L.Ed.2d 129) (1964) (concurring opinion). 391 U.S. at 382, 88 S.Ct. at 1682.
 
 
 29
 The appellants argue that the two ordinances in the present case are unconstitutional in that they directly impair the right of free expression guaranteed by the First Amendment; that they violate the due process clause of the Fourteenth Amendment in that they are both vague and overbroad; that they fail to provide proper procedural safeguards to those affected by their provisions; and that they violate the equal protection clause of the Fourteenth Amendment. We reject the argument that the real purpose of the ordinances is to bypass the requirements for criminal prosecution of persons disseminating obscene materials and to effect this end indirectly by means of zoning and licensing regulations. We are bound by the legislative statement of the purpose of these acts and note that in United States v. O'Brien, supra, the Court held that it is only the effect of legislation which is important in considering a constitutional challenge, not its purpose. Therefore, regardless of the purpose of the legislation, if its effect is to establish a means by which undesirable films and books which have not been declared obscene may be regulated in a way which makes resort to criminal laws dealing with obscenity largely unnecessary, the device is subject to close scrutiny. See Bantam Books v. Sullivan, 372 U.S. 58, 69, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). We also note that although the application of the ordinances is confined to "adult" forms of entertainment, they are not designed to protect minors from harmful influences. Compare Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968).
 
 
 30
 There can be no doubt that movies, though they may be intended primarily for entertainment and are produced for profit, are a form of expression protected by the First Amendment. Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 501, 72 S.Ct. 777, 96 L.Ed. 1098 (1952); Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); Interstate Circuit v. Dallas, 390 U.S. 676, 682, 88 S.Ct. 1298, 20 L.Ed.2d 415 (1968). Each of the cases just cited dealt with statutes and ordinances which were found to violate the due process guarantees of the Fourteenth Amendment, either because of vagueness or overbreadth or failure to provide for speedy judicial determination of the validity of the particular restraint applied. Believing as we do that the two ordinances under consideration in this case are invalid under the equal protection clause of the Fourteenth Amendment, we will pass to a discussion of that issue without dwelling on the due process challenges.
 
 
 31
 In Harper v. Virginia Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), a poll tax case, the Supreme Court stated: "We have long been mindful that where fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined." (Citations omitted.) 383 U.S. at 670, 86 S.Ct. at 1083. To be valid a statutory classification which affects fundamental freedoms must be necessary to the achievement of a compelling state interest and not just rationally related to a valid public purpose. Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). Since the materials to be exhibited in the theatres of appellants have not been judicially declared obscene under the criteria and procedures prescribed by the Supreme Court in Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), and related cases, these materials are presumptively within the protection of the First Amendment. The rights guaranteed by the First Amendment are recognized as among the most fundamental rights possessed by a free people. In the present case, claims of abridgment of freedom of expression are conjoined with claims of denial of equal protection. When an equal protection challenge is based on a classification which results in abridgment of First Amendment rights, those seeking to uphold the classification bear a heavy burden.
 
 
 32
 The City did not discharge its heavy burden of justifying the prior restraint which these ordinances undoubtedly impose by merely establishing that they were designed to serve a compelling public interest. Since fundamental rights are involved, the City had the further burden of showing that the method which it chose to deal with the problem at hand was necessary and that its effect on protected rights was only incidental. The City could legally regulate movie theatres and bookstores under its police powers by providing that such establishments be operated only in particular areas. It might also have validly provided that such establishments be operated only during certain hours. Cases permitting reasonable regulations as to "time, place and manner" were discussed by the Supreme Court in the recent opinion in Grayned v. City of Rockford, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). However, this ordinance selects for special treatment particular business enterprises which fall within the general business classifications permissible under zoning laws and classifies them as regulated uses solely by reference to the content of the constitutionally protected materials which they purvey to the public.
 
 
 33
 A local law, similar in its effect on First Amendment rights, was considered by the Supreme Court in Police Department of Chicago v. Mosley, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). There the City of Chicago had enacted an ordinance prohibiting picketing within 150 feet of any school building during classes "provided that this subsection does not prohibit the peaceful picketing of any school involved in a labor dispute." The Court held that the ordinance was invalid because it described what was permissible picketing in terms of its subject matter, stating, "But, above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." Id. at 95, 92 S.Ct. at 2290. The City of Chicago asserted that the ordinance dealt with a compelling public interest and that its purpose was not to impose improper content censorship, but to prevent disruption in the schools. The Court recognized that the City did have a substantial interest in the end which it was seeking to achieve, but determined that the ordinance sought to advance this interest in a manner which was inconsistent with the requirements of the equal protection clause. The ordinances in the present case, like those in Mosley, "slip(ped) from the neutrality of time, place, and circumstances into a concern about content." 408 U.S. at 99, 92 S.Ct. at 2292, quoting from: Kalven, The Concept of the Public Forum: Cox v. Louisiana, 1965 Sup.Ct.Rev. 29.
 
 
 34
 Decided on the same day as Mosley was Grayned v. City of Rockford, supra, in which an anti-noise ordinance was upheld because it "is narrowly tailored to further Rockford's compelling interest in having an undisrupted school session conducive to the students' learning, and does not unnecessarily interfere with First Amendment rights." 408 U.S. at 119, 92 S.Ct. at 2305. The Rockford ordinance applied to all noise or diversion which might disrupt school sessions or classes without any classifications which required scrutiny under the equal protection clause. In Konigsberg v. State Bar, 366 U.S. 36, 50-51, 81 S.Ct. 997, 1007, 6 L.Ed.2d 105 (1961), Mr. Justice Harlan spoke of "general regulatory statutes, not intended to control the content of speech but incidentally limiting its unfettered exercise, (which) have not been regarded as the type of law the First or Fourteenth Amendment forbade Congress or the States to pass, when they have been found justified by subordinating valid governmental interests . . ." (emphasis added). The ordinances under review in the present case do not fit this description.
 
 
 35
 This court is keenly aware of the serious problems created in the major cities of the country by the deterioration of established neighborhoods. We are particularly sensitive to the problems of Detroit, the largest city within this Circuit. In holding that the two ordinances under review are unconstitutional we do not suggest that the City of Detroit is powerless to deal with its urban problems. On the contrary, we urge it to heed the advice of Mr. Justice Marshall in his dissent in Village of Belle Terre v. Boraas, supra, where he stated, "I would find the challenged ordinance unconstitutional. But I would not ask the village to abandon its goal of providing quiet streets, little traffic, and a pleasant and reasonably priced environment in which families might raise their children. Rather, I would commend the town to continue to pursue those purposes but by means of more carefully drawn and even-handed legislation." 416 U.S. at 20, 94 S.Ct. at 1546.
 
 
 36
 The judgment of the district court is reversed for entry of a declaratory judgment that the two ordinances considered herein are invalid under the equal protection clause of the Fourteenth Amendment, and for further proceedings consistent therewith. Costs to the appellants.
 
 
 37
 CELEBREZZE, Circuit Judge (dissenting).
 
 
 38
 In 1962 the City of Detroit decided to take action against the creation of "skid row" areas by providing that no more than one of certain types of businesses could thereafter locate within 1000 feet of another. The "designated uses" so regulated included bars, hotels, pawnshops, billiard halls, secondhand stores, taxi dance halls, and other establishments which in proximity to each other gave areas a "skid row" appearance and thereby contributed to the decline of nearby residential communities.
 
 
 39
 Ten years later the City added four other businesses to the list of "designated uses" adult book stores, adult motion picture theaters, adult mini motion picture theaters, and group "D" cabarets. The ordinance currently under attack requires that no more than two of these businesses be located within 1000 feet of each other. Pre-existing businesses are not affected, and waiver of the limitation can be obtained upon proof that a business's entry into a neighborhood will not have the effect the ordinance was designed to prevent.[1]
 
 
 40
 Appellants filed suit in order to establish adult motion picture and mini motion picture theaters in certain areas of Detroit where the 1000-foot provision would bar their location. The District Court struck down a more restrictive section of the zoning code which is found to be "an almost total ban on uses conceded by the Defendants to be lawful." That ruling has not been appealed.
 
 
 41
 The District Court upheld the 1000-foot provision. It found that this section was "no greater than is essential to the furtherance of a legitimate governmental interest in preserving and stabilizing neighborhoods," and that it imposed only a "slight" and "incidental" burden on First Amendment rights.
 
 
 42
 The majority's opinion reverses this holding and renders Appellants free to locate their businesses without the interference of the challenged ordinance.
 
 
 43
 I believe that the Detroit ordinance before us[2] is a legitimate exercise of the City's police power. The plight of our cities requires that public officials have tools adequate to prevent their decline and collapse as centers of life and work. It was recognition of the need for a powerful, flexible means of coping with the complexities of urban growth which led the Supreme Court in 1926 to reject the challenge of private property owners to the very concept of zoning:
 
 
 44
 Building zone laws are of modern origin. They began in this country about twenty-five years ago. Until recent years, urban life was comparatively simple; but, with the great increase and concentration of population, problems have developed, and constantly are developing, which require, and will continue to require, additional restrictions in respect of the use and occupation of private lands in urban communities. Regulations, the wisdom, necessity, and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained, a century ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive. Such regulations are sustained, under the complex conditions of our day, for reasons analogous to those which justify traffic regulations, which, before the advent of automobiles and rapid transit street railways, would have been condemned as fatally arbitrary and unreasonable. And in this there is no inconsistency, for, while the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation. In a changing world, it is impossible that it should be otherwise.
 
 
 45
 (T)he question whether the power exists to forbid the erection of a building of a particular kind or for a particular use, like the question whether a particular thing is a nuisance, is to be determined, not by an abstract consideration of the building or of the thing considered apart, but by considering it in connection with the circumstances and the locality. (Citation omitted) A nuisance may be merely a right thing in the wrong place, like a pig in the parlor instead of the barnyard. If the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control.
 
 
 46
 Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 386-87, 388, 47 S.Ct. 114, 118, 71 L.Ed. 303 (1926).
 
 
 47
 A municipality's right reasonably to regulate uses of private property, in a manner consistent with the reach of its police power, has become ingrained in our law. Zoning may be based on values which are
 
 
 48
 spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled.
 
 
 49
 Berman v. Parker, 348 U.S. 26, 33, 75 S.Ct. 98, 103, 99 L.Ed. 27 (1954).
 
 
 50
 As stated most recently in Village of Belle Terre v. Boraas, 416 U.S. 1, 8, 94 S.Ct. 1536, 1540, 39 L.Ed.2d 797 (1974), a zoning ordinance is
 
 
 51
 economic and social legislation where legislatures have historically drawn lines which we respect against the charge of violation of the Equal Protection Clause if the law be 'reasonable, not arbitrary' (citation omitted) and bears 'a rational relationship to a (permissible) state objective.' . . .
 
 
 52
 A quiet place where yards are wide, people few, and motor vehicles restricted are legitimate guidelines in a land-use project addressed to family needs. . . . The police power is not confined to elimination of filth, stench, and unhealthy places. It is ample to lay out zones where family values, youth values, and the blessings of quiet seclusion and clean air make the area a sanctuary for people.
 
 
 53
 The City of Detroit has exercised its police powers to maintain its neighborhoods, if not as sanctuaries, at least as liveable habitats. It has attempted to prevent its neighborhoods from being overrun and dominated by "adult" business which bring crime in their wake and destroy residential qualities. The purpose of the 1000-foot provision was expressed in an affidavit of a qualified sociologist and Detroit councilman, Melvin Ravitz:
 
 
 54
 The ordinance in question seeks to restrict the concentration of the specified uses on the ground that any such concentration is an actual danger sign in a residential neighborhood. It is such a threat in that it leads people to believe the neighborhood is declining and more of the kind of people who accept a declining neighborhood will flock there. This process hastens the reality of neighborhood decline.
 
 
 55
 Designated uses in concentration create a "skid row" atmosphere, Detroit's Common Council determined, and the zoning ordinances were amended to prevent this from recurring.[3]
 
 
 56
 As Appellants argue, the 1000-foot provision has an impact on their ability to market films which are not obscene, thereby affecting First Amendment rights. The test for an ordinance which affects First Amendment rights was succinctly stated in United States v. O'Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968):
 
 
 57
 (A) government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.
 
 
 58
 The majority and I agree that the ordinance is within Detroit's police power and that it furthers a compelling public interest the preservation of urban neighborhoods.
 
 
 59
 We part ways over the last two hurdles of the O'Brien test.
 
 
 60
 The majority finds that the ordinance violates the equal protection clause by classifying films and printed materials on the basis of their content. In other words, the majority holds that Detroit's interest in preserving urban neighborhoods is not "unrelated to the suppression of free expression."
 
 
 61
 I do not view the 1000-foot provision as a regulation of speech on the basis of its content. Rather, it is a regulation of the right to locate a business based on the side-effects of its location. The interest in preserving neighborhoods is not a subterfuge for censorship.
 
 
 62
 In Police Department of Chicago v. Mosley, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972), on which the majority relies for its per se ban of regulation based on content,[4] the content of speech was the sole basis for the City's action. The Mosley ordinance forbade peaceful picketing near a school unless the picket's subject was a labor dispute. Furthermore, the Mosley ordinance was not a mere regulation of the right to picket, but was an absolute ban on picketing near schools, unless the picketing was labor-related.
 
 
 63
 This is not our case. The City of Detroit has not imposed an outright or de facto ban on adult establishments. As the District Court found, adult establishments may locate in "myriad locations in the City of Detroit" under the 1000-foot provision. It is only their concentration that is forbidden. The ordinance is, accordingly, a "time, place and manner" regulation, which the courts have consistently upheld. Grayned v. City of Rockford, 408 U.S. 104, 115, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); Cox v. New Hampshire, 312 U.S. 569, 576, 61 S.Ct. 762, 85 L.Ed. 1049 (1941).
 
 
 64
 The basis for this regulation, furthermore, is not a desire on the City's part to censor the materials offered by such establishments. Rather, the ordinance is solicitous of the needs of adult businesses, as the Ravitz affidavit makes clear:
 
 
 65
 Were they the sort that could flourish under conditions of concentration, then, indeed, we would seek to house all of them in one or two sections of the City. They are not, however, uses of this sort; like other commercial uses, they require proximity to residential areas and access to a suitable market. For this reason we cannot apply the usual zoning approach to them.
 
 
 66
 The ordinance goes out of its way not to bar these businesses from a convenient market. Its purpose is, rather, to prevent the breakdown of neighborhoods caused by undue concentrations of these businesses. If non-adult bookstores and theaters contributed to neighborhood blight in the same way that adult businesses do, the City would, no doubt, include them as designated uses under the ordinance, just as shoe-shine parlors and bars are included.
 
 
 67
 It is not a control on the basis of content in which the City of Detroit is engaging. It is, instead, a justifiable distinction in neighborhood impact that underlies the differential treatment between adult and non-adult businesses. This amply distinguishes our case from Mosley, where the City was unable to justify a differential treatment of peaceful labor picketing and peaceful non-labor picketing. The only conceivable reason for the difference in Mosley was that the City sought "to restrict expression because of its message, its ideas, its subject matter, or its content." Mosley, 408 U.S. at 95, 92 S.Ct. at 2290. That is not the purpose of Detroit's ordinance.
 
 
 68
 I am convinced that the Detroit ordinance clears the fourth and final hurdle of O'Brien as well that "the incidental restriction on alleged First Amendment freedoms (be) no greater than is essential to the furtherance of (Detroit's) interest" in preserving neighborhoods.
 
 
 69
 Detroit has provided that no more than two designated uses may locate within 1000 feet of each other. This insures that adult businesses are able to locate in many places in the City and that residents have convenient access to their offerings. Thus, publishers and consumers of adult materials are not significantly affected by the ordinance. It is only the businessmen who seek to make a larger profit out of operating adult businesses by locating near similar enterprises who suffer. The effect of the ordinance, therefore, is to prevent a concentration of adult businesses in any area of the City but not to stifle the flow of commerce between distributors and the public.
 
 
 70
 The majority suggests that the City could devise a less restrictive and even-handed method of furthering its objective. It suggests no less restrictive alternative, however, and I can see none. If Detroit is to prevent its neighborhoods from turning into sex-oriented skid rows, catering to the tastes of only one stratum of society and driving out stable residential populations, it must be allowed to limit the number of adult establishments in any area of the City. That is what the 1000-foot provision seeks to do.
 
 
 71
 Nor does the majority suggest a feasible, more even-handed approach. It suggests that Detroit could legally accomplish its goals by requiring all bookstores and theaters to locate in enclaves within the City or by restricting their hours of operation. Neither solution would serve the purpose of preventing concentrations of "adult" businesses. Indeed, the first suggested solution would accomplish precisely what Detroit seeks to prevent. Both solutions, furthermore, would impose restrictions on non-adult bookstores and theaters that have no relation to any demonstrated legitimate public purpose. Thus, they would run afoul of the first two parts of the O'Brien test. The majority's call for "even-handed" legislation would suggest that it considers adult and non-adult bookstores and theaters to pose similar threats to the stability of neighborhoods. The record in his case belies this conclusion and establishes the legitimate reasons for treating adult establishments in the same manner as pool rooms and bars, without treating non-adult theaters and bookstores similarly.
 
 
 72
 I too am vigilant to protect our First Amendment freedoms. They must not be eroded out of misguided good intention. The First Amendment, however, was not intended to be the death-knell of cities. Detroit has carefully attempted to prevent its neighborhoods from becoming sex-oriented, crime-ridden wastelands, without unduly infringing the public's right to buy and the publisher's right to distribute non-obscene materials. The First Amendment does not condemn this effort.
 
 
 73
 It seems to me that if we are to prevent our cities from becoming uninhabitable jungles, we must, within constitutional safeguards, restore to our cities the right of self-government.
 
 
 74
 I find the zoning is a proper exercise of the police powers of the City of Detroit and would affirm the District Court's findings and Judgment.
 
 
 
 [1]
 The majority's opinion includes citations of the relevant portions of the ordinance under attack, except for the waiver provision, which is as follows:
 "Section 66.0101.
 The Commission may waive this locational provision for Adult Book Stores, Adult Motion Picture Theaters, Adult Mini Motion Picture Theaters, Group "D" Cabarets, hotels or motels, pawnshops, pool or billiard halls, public lodging houses, secondhand stores, shoeshine parlors, or taxi dance halls if the following findings are made:
 a) That the proposed use will not be contrary to the public interest or injurious to nearby properties, and that the spirit and intent of this Ordinance will be observed.
 b) That the proposed use will not enlarge or encourage the development of a 'skid row' area.
 c) That the establishment of an additional regulated use in the area will not be contrary to any program of neighborhood conservation nor will it interfere with any program of urban renewal.
 d) That all applicable regulations of this Ordinance will be observed."
 
 
 [2]
 The sole provision before us is the 1000-foot prohibition, barring the location of new adult businesses within 1000 feet of another use designated under section 66.1000
 
 
 [3]
 The Ravitz affidavit vividly describes the evils which attend the development of "adult" skid-row areas. Other affidavits provide ample support for Detroit's method of combatting neighborhood decay. As one qualified journalist put it,
 "The real battle is with the criminalization of the sex business. What follows commercial pornography, which is the meat of the material offered by "adult" businesses, is prostitution. What follows prostitution is street crime, and what follows the crime reports is the demoralization of the legitimate businessmen and the drying up of the tax bases of our cities."
 A Detroit City Plan Commission expert amplified this sentiment:
 "Aside from the deleterious appearance usually associated with this type of area, numerous social problems are also generated by "skid rows". These include the alcoholic, the drug addict, prostitution, crime, low rent housing for the single adult attracting senior citizens on a fixed income, the mission church, food kitchens, pan-handlers, and generally an assembly point for all the human derelicts of society."
 
 
 [4]
 The majority interprets Mosley to mean that no distinctions at all may be made between different categories of speech. Not even Mr. Justice Marshall, whose Belle Terre dissent is invoked, goes this far. His dissent in that case was based on the belief that fundamental rights were affected and that Belle Terre had been both under- and over-inclusive in its attempt to accomplish admittedly valid objectives. Mr. Justice Marshall's dissent reiterates the fourth part of the O'Brien test: "(O)nce it be determined that a burden has been placed upon a constitutional right, the onus of demonstrating that no less intrusive means will adequately protect the compelling state interest and that the challenged statute is sufficiently narrowly drawn, is upon the party seeking to justify the burden." 416 U.S. at 18, 94 S.Ct. at 1545. Had the distinction made by Belle Terre between unrelated persons and family members met this test, Mr. Justice Marshall would have upheld it, despite its distinguishing between persons on the basis of what are in his view constitutionally protected associations. An ordinance may utilize what on the surface appears to be a distinction based on content if the basis for the distinction rests on concerns unrelated to the suppression of constitutional rights. The basic question is whether the method chosen is "necessary to promote a compelling state interest," Kramer v. Union Free School District, 395 U.S. 621, 627, 89 S.Ct. 1886, 1890, 23 L.Ed.2d 583 (1969). See also Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); Shuttlesworth v. City of Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969)