[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 173 
Unlawful assembly and parading without permit; 6 months, $250.00 fine.
Roger Handley and others agreed to a trial without a jury on a stipulation of facts. Each appellant, after conviction, was granted one year unsupervised probation and notice of appeal was given. They are now represented by retained counsel on this appeal.
Because this consolidated appeal concerns the constitutionality of Article XVII of the Montgomery City Traffic Code in conjunction with Montgomery City Ordinance No. 100-76, a question in which application of the law to the facts is crucial, we here include the stipulated facts, which were before the trial court, in their entirety:
 "A. Mayor Emory Folmar, if called to testify would state as follows:
 "He is the Mayor of the City of Montgomery and at the time of the arrest of the Defendant was the Mayor of said City. At the time of the enactment of Ordinance 176, he was Chairman of the City Council. It is imperative that the Council have an opportunity to review the agenda for the next Council meeting prior to the night of the Council meeting. Council meetings are on Tuesday nights. Everyone who has an interest in City business should have a right to know what is on the agenda. This includes news media, Council members and interested citizens. The agenda for the next Council meeting is closed at noon on the Friday before the Tuesday meeting, pursuant to Ordinance 176. The reason for closing the agenda at noon on the Friday prior to the Tuesday Council meeting is so that all the facts can be made known to members and the agenda can be published to the end that all citizens and other interested persons can examine the agenda and know what will come up at the Tuesday night Council meeting.
 "Each Council member is given a packet of all matters to come before the Council Tuesday night. This is usually delivered to the Council members on Friday afternoon. It is imperative in the Mayor's opinion that this be done so that the proper persons can be present at the Council meeting and answer pertinent questions and arrangements can be made to have the necessary people present at the Council meeting to discuss the matters before the Council.
 "A parade permit is required by the City of Montgomery so that the City can provide for the safety of its citizens, not only those who parade, but also those along the parade route. The staffing of the Police Department for traffic control, crowd control and general safety measures are not matters that can be done without advance notice. Overtime arrangements, shifting of assignments, rerouting of traffic, vehicle designations and *Page 174 
other logistical problems must be considered and a decision made on these problems. Decisions cannot be made without advance notice of the parade. If two parades are scheduled, there could be conflicting routes marked and that could lead to complicating factors of safety, traffic otherwise.
 "At no time has a parade permit ever been granted anyone without it having been placed on the agenda in accordance with Ordinance 176. Other Ku Klux Klan groups have been granted two parade permits this year after having timely sought permits and being placed on the agenda. Only matters involving emergencies have been placed on the agenda without compliance with Ordinance 176.
 "B. Chief Charles Swindall, if called to testify would state as follows:
 "He is the Chief of Police for the City of Montgomery and has been in law enforcement for twenty-six years. It is necessary that the Police Department have advance warnings of parades for the reasons outlined in Mr. Folmar's testimony. More officers are needed to patrol Klan parades than other parades because weapons may be involved. Official intelligence reports of Klansmen with ax handles, pick axes, hoe handles, bows and arrows, shotguns and rifles were known to the Police Department before the arrest of the Defendant. Also, a Klansman was quoted in the newspaper as saying, `We will destroy the enemy on our march to the Capitol of Montgomery, Alabama.' Whether or not a Klansman actually made that statement is not known. It was anticipated that it might be necessary to mobilize the National Guard if the Governor agreed to do so. Whatever arrangements necessary to assure the safety of police officers and the citizens had to be made.
 "On August 3, 1979, during the afternoon hours, he received a call from Klansman Roger Handley stating he was at the Department of Public Safety for the State of Alabama. Mr. Handley was told that the time for presenting matters to be put on the agenda for the next Council meeting was past and that he should talk to John Baker, the City Clerk. Mr. Handley was told that the only way to suspend the rules and get on the agenda was to get a Council member to sponsor him. On Tuesday, August 7, 1979, he, Swindall, was in attendance at the regular Council meeting and pointed out Council President Willie Peek to Mr. Handley. He saw Mr. Handley and Mr. Peek talking but did not know what they said.
 "After the denial of the temporary restraining order by the United States District Court and the refusal of the Fifth Circuit Court of Appeals to grant the Temporary Restraining Order, he assumed that the Defendant would not march in violation of the law. The Defendant was told that if he paraded without a permit, he would be arrested. Defendant paraded without a permit and was arrested. Traffic was hampered by the paraders.
 "C. Mr. John Baker, if called to testify, would state as follows:
 "He is the Clerk of the City of Montgomery and charged with the responsibility of making up the agenda for the City Council. Sometime before Noon, August 3, 1979, Mr. Roger Handley requested and was given an Application for a Parade Permit. He was instructed to fill out the permit and return it. At some time between 1:30 P.M. and 3:30 P.M. on August 3, 1979, Mr. Handley returned with the Parade Permit Application and was told that the deadline for presenting matters to be placed on the Council agenda for the following Tuesday was 12:00 Noon, which had passed. Mr. Handley left with the Application which has yet to be filed with the City.
 "D. Roger Handley, if called to testify, would state as follows:
 "The purpose of the parade was to call the attention that the white people of this country have lost a great deal of civil rights, are faced with reverse discrimination and job quota hiring and promotion. White people are passed over that are *Page 175 
more qualified for positions simply for a minority person to be placed in a position because they are a minority. Because we are a majority, we are discriminated against, violating our civil rights.
"It is further stipulated that:
 "E. The refusal to place Mr. Handley's application on the Tuesday, August 7, 1979 Council agenda, which was the last regular meeting of the City Council prior to the August 12, 1979 proposed date of the parade, was based upon City Ordinance 176, which Ordinance is attached hereto and is admitted to be duly enacted and in full force and effect.
 "F. That on August 7, 1979, immediately prior to the regular meeting of the City Council of the City of Montgomery, Roger Handley met with the President of the City Council of the City of Montgomery, Alabama, Mr. Willie Peek, for the purpose of being allowed on the agenda to present the request for a Parade Permit herein described to the City Council. Mr. Peek refused to sponsor Mr. Handley's request to be placed on the Council agenda. On Friday, August 10, 1979, a civil action was prosecuted in the Federal District Court for the Middle District of Alabama seeking a Temporary Restraining Order allowing the parade as herein described to go forward. The City of Montgomery, Alabama appeared through its counsel at said hearing and defended the City's action. The Federal District Court denied the Temporary Restraining Order. On Saturday, August 11, 1979, a Petition for Emergency Appeal to the United States Circuit Court of Appeals for the Fifth Circuit from the ruling above mentioned in the District Court for the Middle District of Alabama was denied. Handley had conferred with the Department of Public Safety for the State of Alabama for approximately one month concerning the conduct of the parade from Selma to Montgomery. The State officials had not conferred with the City of Montgomery officials concerning the parade plans made known to the state officials.
 "G. On Saturday, August 11, 1979, a group of persons marching under the auspices of the Invisible Empire Knights of the Ku Klux Klan as a part of a march from Selma, Alabama, to Montgomery, Alabama entered the police jurisdiction and were stopped by Montgomery Police Department personnel and were told that they could not parade in the City of Montgomery without a permit. They were told they could disburse and go to their campsite.
 "H. On Sunday, August 12, 1979, the Defendant, in the company of approximately two hundred persons, was walking along the side of Highway 80 as a part of a parade or march within the police jurisdiction of the City of Montgomery. Defendant was arrested for parading without a permit in violation of Article XVII of the Montgomery Traffic Code.
 "I. The parade or march participated in by Defendant was a public assembly within the definition of XVII of the Montgomery Traffic Code.
 "J. A true copy of Ordinance 176, Ordinance 54-72 and Article XVII of the Montgomery Traffic Code is attached and is stipulated to as being in force and effect at all times pertinent hereto."
Montgomery City Ordinance No. 54-72, as stipulated in paragraph "J" of the facts, provides for the enactment of a Traffic Code for the City which became effective July 1, 1972. There is no need to set out the further particulars of this ordinance. However, for the sake of clarity, Montgomery City Ordinance No. 100-76 (referred to as Ordinance 176 in the stipulated facts in appellee's brief) and Article XVII of the Montgomery City Traffic Code, also as stipulated in paragraph "J" of the facts, are set out in their entirety as follows:
"ORDINANCE NO. 100-76
"BE IT ENACTED BY THE COUNCIL OF THE CITY OF MONTGOMERY ALABAMA, that Section 6.9 of Ordinance No. 77-75 be amended as follows:
"Section 1.
"Section 6.9. Hearing on petitions, applications, complaints, appeals, communications, *Page 176 
etc. Such items must be in the City Clerk's Office by 12:00 noon, Friday preceding the next Council meeting. This is necessary so that the Clerk may prepare the information of these items and distribute to Council members prior to the Tuesday meeting.
"Section 11. This Ordinance shall become effective upon passage, approval and publication, or as otherwise provided by law."
 ARTICLE XVII REQUIREMENTS FOR PARADES AND PROCESSIONS Section 17-1. Permit for Parade or Procession Required. — It is and shall be unlawful to promote, organize, or hold or to assist in organizing or holding, or to take part or to participate in, any parade or procession or other public demonstration on the streets or other public ways of the City of Montgomery, Alabama, unless a permit therefor has been secured from the Board of Commissioners.
To secure such a permit, written application as hereinafter provided shall be made to the Board of Commissioners, setting forth the hour and date, the probable number of persons, vehicles and animals which will be engaged in such parade, procession or any other public demonstration, the purpose for which it is to be held or had in the streets or public ways over, along, or in which it is desired to have or hold such parade, procession or public demonstration. The Board of Commissioners as hereinafter provided shall grant a written permit for such parade, procession or public demonstration prescribing the streets or public ways which may be used therefor upon recommendation of the Chief of Police, unless there exists such conditions for refusal as contained in this article. It shall be unlawful to use for such purposes at the hour and on the date requested on any other streets or public ways than those set out in such permit.
This section shall not apply to funeral processions.
Section 17-2. Defines. — In this section the following words, terms and phrases shall have the meaning respectively ascribed to them in this section:
(a) Public assembly — A public assembly within the meaning of this section shall and the same is hereby declared to be any parade, march, formation, procession, group of pickets, picket line, demonstration, movement, assemblage, muster or display of persons, animals, floats, motor vehicles, or combinations thereof on the public sidewalks, streets, highways, or other public ways which require and necessitate extraordinary traffic control and rerouting, extraordinary police protection and crowd control or substantial prior planning which cannot be accomplished by simple parole or written notice to the Department of Police, and which is for the purpose of presenting a cause; or for the purpose of expression and opinion to the general public on any particular issues; or for the purpose of protesting or influencing any state of affairs or decision rendered or to be rendered thereon whether political, economic, or social; or for the purpose of celebrating, marking or commemorating any past, present or future event or occurrence, whether historical or otherwise; notwithstanding that such public assembly may be tranquil and devoid of noise, tumult and quarrelsome demeanor and does not disturb the public peace; and regardless of whether the persons participating and engaging therein march, move about, or patrol, display signs, placards, flags, banners, cards or combinations thereof, or sing, shout, chant, cant, yell or clap their hands; provided, however, that a funeral procession and service shall not be considered a public assembly.
(b) Residential Area — The territory contiguous to and including the sidewalk, street, highway or other public way when the property thereon for a distance of Three Hundred (300) feet or more is in the main improved with residences or dwelling houses.
(c) Near — The word "near" shall mean within sight or hearing.
(d) Lude — The word "lude" shall mean obscene, lustful, indecent, lascivious, lecherous or immoral. *Page 177 
(e) Obscene — The word "obscene" shall mean that which is offensive to chastity of mind or to modesty, expressing or presenting to the mind or view something that delicacy, purity and decency forbids to be exposed. It shall also mean that which is indecent lewd, licentious, foul, filthy, libidinous and of such character as to deprave and corrupt those whose minds are open to such immoral influences, or calculated, with the ordinary person to deprave his morals or to lead to impure purposes intending to excite feelings of an impure or unchaste stirring the sex impulses and leading to sexually impure and lustful thoughts.
(f) Profane — The word "profane" shall mean that which is irreverent or contemptuous toward deity.
(g) Libelous — The word "libelous" shall mean any false and malicious publication which charges an offense punishable by indictment, or which tends to bring a person into public hatred, contempt or ridicule or charges an act odious and disgraceful in society.
(h) Insulting or Fighting Words — The phrase "insulting or fighting words" shall mean those words which by their very utterance inflict injury or tend to incite an immediate breach of the peace by addressee, including classical fighting words, words in current use less classical but equally likely to cause violence and disorderly words, including profanity, obscenity and threats.
(i) Epithet — The words "epithet" shall mean any adjective, term, phrase or expression which denotes or connotes a quality or attribute regarded as characteristic of the person.
(j) Unlawful Demand, Purpose, End or Objective — The phrase "unlawful demand, purpose, end or objective" shall mean any such demand, purpose, end, or objective which subverts or tends to subvert any public policy of the State of Alabama; provided such policy is constitutional.
(k) Church — The word church shall mean any building or place of assembly used as a house of worship by any group or congregation of persons of whatever name or calling, whether Jewish, Roman Catholic, Greek Orthodox, Unitarian, Protestant or other.
Section 17-3. Board of Commissioners to Issue Permit. — The Board of Commissioners of said city shall issue a permit in writing to any person, organized group or unincorporated association of persons or to any corporation organized and existing under the Laws of the State of Alabama or any other state, provided such corporation is qualified to do business within the State of Alabama, upon proper application therefor as hereinafter provided, permitting participation and engagement in a public assembly within the City of Montgomery, Alabama, on the terms and conditions and pursuant to the procedure, hereinafter declared.
Section 17-4. Form of Application for Permit. — Said application shall be directed to the Board of Commissioners of said city in writing and shall be considered and acted upon at any regular or special meeting thereof.
(a) Contents of Application. — The application for permit shall contain the following items of information:
1. The purpose of the public assembly.
 2. The type, nature and character of the public assembly.
3. The date of the public assembly.
4. The inclusive times of the public assembly.
 5. The probable number of persons, animals, floats, and motorized vehicles to participate or engage in the public assembly.
 6. The place, area, locality or route of the public assembly.
 7. A description, including size and wording of any and all signs, placards, banners, flags or cards to be carried and the names and words of any songs to be sung, chants to be chanted or cheers to be yelled.
(b) Execution of Application for Permit. — The application must be executed in the name of the organized group or unincorporated association of persons or corporation by one having the authority of a general agent thereof. *Page 178 
Section 17-5. Contents of Permit. — Said permit for a public assembly shall contain terms and conditions in substantial conformity with the items of information in the application, and the Board of Commissioners shall modify where possibly, any item of information, which, if left unmodified, would necessitate the refusal of a permit under Section 17-10 hereof. No other term or condition shall be placed in the permit except solely for the safety and protection of those engaging or participating in such public assembly or solely for the convenience of public use of sidewalks, streets, highways, or other public ways, and for no other purpose; and it shall be a violation of this section for any person or persons participating or engaging in such public assembly to disregard or fail or refuse to obey any term or condition in the permit.
Section 17-6. Offenses While Participating or Engaging in, or Observing the Public Assembly. — Whoever while participating or engaging in or observing a public assembly as defined in and permitted by this section, addresses any lude, obscene, profane, libelous, insulting or fighting word or words to another; or, disobeys or disregards any traffic control device, signal or regulation, except when ordered to do so by an officer of the Department of Police of the City of Montgomery, Alabama; or utters any absolute epithet toward any person; or wilfully and intentionally disobeys or disregards any lawful order of any officer of said department of police; or, wilfully and intentionally urinates or defecates on any sidewalks, street, highway or public way; or encourages by word or act or both the commission of any crime or quasi crime; or, assists, attempts, or participates in cordoning off a sidewalk, street, highway or other public way, or entrance to any building, public or private, allowing no one else to pass; or, participates or engages in any illicit sex act; or, wilfully intentionally lies prone or sits upon any sidewalk, street or highway or other publicway so as to obstruct, impede, hinder, stifle, retard or restrain passage or traffic thereon; or, assaults, spits on or at or throws any missile at any officer of said department of police; or, fails or refuses to disperse quickly and quietly at the permitted time; shall, upon conviction be fined not more than Two Hundred ($200.00) Dollars or sentenced to imprisonment or hard labor for the City of Montgomery, Alabama, not exceeding six (6) months or both such fine and imprisonment in the discretion of the municipal judge hearing the case.
Section 17-7. Prohibition Against Public Assemblies in Residential Area. — The Board of Commissioners shall refuse to issue a permit for any public assembly in any residential area as herein defined and it shall be a violation of this section for any person or persons to participate or engage in a public assembly in such area in the City of Montgomery, Alabama; provided however, that nothing herein contained shall prohibit mere peaceful picketing in accordance with the terms and conditions of this section, of any business or commercial establishment within such residential area nor shall anything herein contained prohibit a parade or march from merely passing through such residential area.
Section 17-8. Prohibition Against Public Assemblies at or Near Churches. — The Board of Commissioners shall refuse to issue a permit for any public assembly at or near any church as herein defined and it shall be a violation of this ordinance for any person or persons to participate or engage in a public assembly at or near such church in the City of Montgomery, Alabama; provided, however, that nothing herein contained shall be construed to prohibit orderly and lawful meetings at such churches or on such church grounds, for any of the purposes expressed in Section 17-1 herein, or for any other lawful or religious purpose, nor shall anything herein contained prohibit a parade or march from merely passing by at or near any church.
Section 17-9. Conditions on Which Permit is to be Refused. — The Board of Commissioners shall refuse to issue a permit for a public assembly when any one or more of the following conditions is apparent from clear and convincing evidence or if evident from the application itself. *Page 179 
(a) The purpose of the public assembly, whether so stated in the application or not, is the encouragement of the commission of a crime or quasi crime or is the accomplishment of an unlawful demand, purpose, end or objective.
(b) The signs, placards, banners, flags or cards to be carried, or the songs to be sung, or the chants to be chanted, encourage or advocate the commission of a crime or quasi crime or the accomplishment of an unlawful demand, purpose, end or objective, contain lude, obscene, profane, libelous, insulting or fighting words or language or abusive epithets; or are to be used in such circumstances or are of such nature as to create a clear and present danger of riot or rout; but nothing herein contained shall cause words or language merely expressing unpopular views to be so construed.
(c) The proposed public assembly is so large as to prohibit its control and protection by the Department of Police of the City of Montgomery, Alabama; or is so large or is such that it will substantially and materially interrupt and interfere with the free flow of commerce and trade and use of the sidewalks, streets, highways and other public ways in said City for an appreciable period of time.
(d) The proposed public assembly is in an area prohibited by this section.
(e) The proposed public assembly presents a clear and present danger of destruction of life or property, or serious invasions of rights of privacy or breaches of the peace and that danger is imminent and aggravated and amounts to more than slight inconvenience or annoyance.
Section 17-10. Violation of Section. — It shall be a violation of this section to participate or engage in, or to aid, abet, command, counsel or induce any person or persons to participate or engage in a public assembly as herein defined, in the City of Montgomery, Alabama, or in the police jurisdiction thereof, without there having been obtained prior thereto, a permit for such public assembly.
Section 17-11. Action Upon Public Assembly Becoming Violent. — Upon any public assembly becoming violent, the senior ranking officer of the Department of Police of the City of Montgomery, Alabama, present, shall audibly call a halt to such public assembly and shall cause it to forthwith disperse; and it shall be a violation of this section for any person or persons, who having been so ordered, wilfully and intentionally fail or refuse to disperse quickly and quietly.
Section 17-12. Presumption of Evidence. — When any brick, bottle or other missile is thrown at any officer of the Department of Police of the City of Montgomery, Alabama, or, at any other person, it shall be presumed that such public assembly has become violent.
Section 17-13. Waiver of Law Prohibited. — No official of the City of Montgomery and no officer of the Department of Police of said city has or possesses the authority to waive any provision of this section, except as hereinbefore provided.
Section 17-14. Administration. — The Board of Commissioners shall administer this section and shall exercise the limited discretion herein conferred with the uniformity of method of treatment upon the facts of each application, free from improper or inappropriate considerations and from unfair discrimination with a systematic, consistent and just order of treatment, with reference to the convenience of public sidewalks, streets, highways and other public ways in the City of Montgomery, Alabama.
Section 17-15. Provisions Cumulative. — The sections, provisions and violations of this section are cumulative and in addition to other provisions and violations of other ordinances or of the common law or statutes of the State of Alabama.
Section 17-16. Punishment for Violation. — Any person violating any of the provisions of this section shall, upon conviction be fined not less than One ($1.00) Dollar nor more than Two Hundred ($200.00) Dollars or sentenced to hard labor for the City of Montgomery, Alabama, not exceeding six (6) months or both fine and imprisonment *Page 180 
at the discretion of the municipal judge trying the case.
 I
The appellant asserts that: (1) "The provisions of a Montgomery City Ordinance (Article XVII) requiring a permit for a parade of public demonstration constitutes an impermissible prior restraint of speech or assembly as guaranteed by the Constitution of the United States of America," and (2) "The right of freedom of assembly guaranteed by the Constitution of the United States of America may not be made unlawful by statute or ordinance in the absence of the violation of other laws."
We note in paragraphs B and F of the stipulated facts, that appellants moved for a temporary restraining order in the United States District Court for the Middle District of Alabama to allow them to parade or demonstrate in the City of Montgomery as requested. This motion was denied by order of Judge Robert E. Varner on August 10, 1979, in the following language:
 "The City of Montgomery has the right and duty under its police power protected by the Constitution to protect its citizens and all those who come within the boundaries of its jurisdiction from violence.
 "It is the opinion of this Court that the Court has the duty to weigh the First Amendment rights of the plaintiff against the duties and powers under the police power of the City of Montgomery secured by the Constitution to afford persons within its boundaries protection from violence. Other things being equal, First Amendment rights are superior to other constitutional rights.
 "Plaintiff seeks the right to conduct the proposed parade and demonstration within the City of Montgomery by temporarily restraining the City's proposed enforcement of its ordinance prohibiting parades absent leave therefor.
 "This Court is of the opinion that, because of the potential for confusion associated with a parade and because of the necessity that the City provide officers capable of controlling crowds, suppressing violence and directing traffic which may be associated with a demonstration of the sort in question, the City has a controlling State interest in being able to require timely filings for leave to conduct a parade, providing, however, that such time within which the decision of the City Council as to the granting of the petition to parade must be made. The need for at least four days' notice of a proposed demonstration is reasonably necessary for the City fathers to consider the application to parade."
A statute or ordinance is presumed to be constitutional, and the burden is upon the party asserting its unconstitutionality to show that it is not constitutional. Board of Trustees ofEmployees' Retirement System v. Talley, 291 Ala. 307,280 So.2d 553 (1973); It is the duty of a court to sustain an act unless it is convinced beyond a reasonable doubt of its unconstitutionality. Johnston v. Alabama Public ServiceCommission, 287 Ala. 417, 252 So.2d 75 (1971); District ofColumbia v. Edgcomb, 305 A.2d 506 (D.C.Ct.App. 1971).
It is uncontroverted that a municipality must rightfully exercise a great deal of control in the use of its public streets and sidewalks in the interest of traffic regulation and public safety. Shuttlesworth v. City of Birmingham,394 U.S. 147, 152, 89 S.Ct. 935, 939, 22 L.Ed.2d 162 (1969). While picketing and parading may constitute methods of expression entitled to First Amendment protection, Shuttlesworth, supra;Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680,9 L.Ed.2d 697 (1963); Thornhill v. Alabama, 310 U.S. 88,60 S.Ct. 736, 84 L.Ed. 1093 (1940), the First and Fourteenth Amendments do not afford the same kind of freedom to those who would communicate ideas by conduct such as patrolling, marching, and picketing on streets and highways, as these amendments afford to those who communicate ideas by pure speech. Cox v.Louisiana, 379 U.S. 536, 555, 85 S.Ct. 453, 464, 13 L.Ed.2d 471
(1965). When protest takes the form of mass demonstrations, parades, or picketing on public streets and sidewalks, the free passage of *Page 181 
traffic and the prevention of public disorder and violence become important objects of legitimate state concern. Walker v.City of Birmingham, 388 U.S. 307, 316, 87 S.Ct. 1824, 1829,18 L.Ed.2d 1210 (1967). "Governmental authorities have the duty and responsibility to keep their streets open and available for movement." Cox v. Louisiana, 379 U.S., at 554-555,85 S.Ct., at 464.
The authority of a municipality to impose regulations in order to assure the safety and convenience of the people in the use of public highways, sidewalks, and streets has never been regarded as inconsistent with the exercise of civil liberties.Smith v. City of Montgomery, 251 F. Supp. 849, 851 (M.D.Ala. 1966); International Society for Krishna Consciousness, Inc. v.City of New York, 484 F. Supp. 966 (S.D.N.Y. 1979). First amendment rights are not absolute. Reasonable time, place and manner restrictions on the exercise of First Amendment rights have long been recognized as necessary for the protection of other compelling public interests. Grayned v. City of Rockford,408 U.S. 104, 115-116, 92 S.Ct. 2294, 2302-2303, 33 L.Ed.2d 222
(1972); Police Department v. Mosley, 408 U.S. 92,92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); Adderley v. Florida, 385 U.S. 39,87 S.Ct. 242, 17 L.Ed.2d 149 (1966); Concerned Jewish Youth v.McGuire, 621 F.2d 471 (2d Cir. 1980); United States Labor Partyv. Oremus, 619 F.2d 683 (7th Cir. 1980). The Supreme Court stated the following in Cox v. New Hampshire, 312 U.S. 569,61 S.Ct. 762, 85 L.Ed. 1049 (1941):
 "Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses. The authority of a municipality to impose regulations in order to assure the safety and convenience of the people in the use of public highways has never been regarded as inconsistent with civil liberties but rather as one of the means of safeguarding the good order upon which they ultimately depend. The control of travel on the streets of cities is the most familiar illustration of this recognition of social need. Where a restriction of the use of highways in that relation is designed to promote the public convenience in the interest of all, it cannot be disregarded by the attempted exercise of some civil right which in other circumstances would be entitled to protection. One would not be justified in ignoring the familiar red traffic light because he thought it his religious duty to disobey the municipal command or sought by that means to direct public attention to an announcement of his opinions."
Narrow and reasonable regulation of the exercise of rights designed to keep the streets open and safe for travel is not prohibited by the First Amendment. Shuttlesworth, supra;Adderley, supra; Cox v. Louisiana, supra; United States LaborParty, supra.
Municipal permit requirements impinging First Amendment rights are not per se unconstitutional. See Hynes v. Mayor andCity Council of Oradell, 425 U.S. 610, 96 S.Ct. 1755,48 L.Ed.2d 243 (1976); Cox v. New Hampshire, supra; United StatesLabor Party, supra; Smith v. City of Montgomery, supra. It is the unguided discretion of those issuing permits which renders the requirement unconstitutional. Shuttlesworth, supra; Staubv. City of Baxley, 355 U.S. 313, 78 S.Ct. 277, 2 L.Ed.2d 302
(1958). Stated flatly, "A law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." Shuttlesworth,394 U.S. at 150, 89 S.Ct. at 938.
In Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546,95 S.Ct. 1239, 43 L.Ed.2d 448, the court said:
 "Invariably, the Court has felt obliged to condemn systems in which the exercise of such authority was not bounded by precise and clear standards. The reasoning has been, simply, that the danger of censorship and of abridgment of our precious First Amendment freedoms is too great where officials have unbridled discretion *Page 182 
over a forum's use. Our distaste for censorship — reflecting the natural distaste of a free people — is deep-written in our law."
The threshold question is whether Article XVII of the Montgomery Traffic Code is substantively overbroad causing an impermissible prior restraint on First Amendment expression or, conversely, whether Article XVII is sufficiently bounded by precise and clear standards, which have reasonable time, place and manner restrictions, narrowly tailored to further the City of Montgomery's legitimate interest.
The State bears the burden of justifying restrictions Cohenv. California, 403 U.S. 15, 20, 91 S.Ct. 1780, 1785,29 L.Ed.2d 284 (1971). Regulations which take the form of prior restraints are subject to particularly exacting judicial scrutiny.Organizations for a Better Austin v. Keefe, 402 U.S. 415, 419,91 S.Ct. 1575, 1577, 29 L.Ed.2d 1 (1971).
In our judgment, the pertinent sections of Article XVII are not so overbroad as to cause an impermissible prior restraint on First Amendment expression. We find the permit provisions of Article XVII to be sufficiently bounded by precise and clear standards, narrowly tailored to further the City of Montgomery's legitimate interest.
The provisions of Article XVII regulating the authority of the Board of Commissioners to issue a permit for "parade or procession or other public demonstration" are contained in §§ 17-1 17-3, and, in a somewhat more limited sense, in § 17-14. We will not again recite those sections, but would point out that sections 17-3 and 17-14 are the progeny of sections 9-18 (2) and 9-18 (14) respectively of Montgomery City Ordinance No. 22-65. While Article XVII is not the "same" as Ordinance No. 22-65, as contended in appellant's brief, many of its sections are identical.
In Smith v. City of Montgomery, supra, the Federal District Court was of the opinion that Ordinance No. 22-65 was "valid on its face." 251 F. Supp., at 852. We, too, are of the opinion that Article XVII is valid on its face. Both §§ 17-1 and 17-3 of Article XVII contain language, "The Board of Commissioners . . . shall grant (issue) a . . . permit." Furthermore, § 17-14 of Article XVII provides that "The Board of Commissioners shall
administer this section [in regards to each application] . . . free from improper or inappropriate considerations and from unfair discrimination with a systematic, consistent and justorder of treatment. . . ." Contrary to appellant's assertions, these sections make it mandatory upon the Board of Commissioners to issue a permit upon proper application. From a plain reading of Article XVII the Board of Commissioners has no authority or discretion whatsoever to withhold the issuance of a permit for any lawful purpose upon timely application.
Again, contrary to appellant's contention, § 17-1 of Article XVII does not provide the Chief of Police with any authority in the least to issue or withhold a permit to parade, etc. Read in proper context, § 17-1 simply provides that the Chief of Police, due to his special knowledge, may make "recommendation" as to which "streets or public ways" may be used for the parade, etc. Even this "recommendation" appears in no way to be binding on The Board of Commissioners, but is merely in the nature of a suggestion.
In conclusion, Article XVII of the Montgomery Traffic Code is quite unlike § 1159 of the General Code of Birmingham, which was struck down in Shuttlesworth, supra. Article XVII provides mandatory procedures for The Board of Commissioners to follow in all cases. These procedures are to be applied in a non-discriminatory fashion. There is no provision in Article XVII, as in § 1159, that the Commissioners "be guided only by their own ideas of `public welfare, peace, safety, health, decency, good order, morals or convenience.'" Shuttlesworth,394 U.S., at 150, 89 S.Ct. at 938. The constitutional guarantees of the First Amendment are not contingent upon the uncontrolled will of an official given unbridled and absolute power under Article XVII. On the contrary, the provisions of *Page 183 
Article XVII are narrowly tailored by precise and clear standards necessary to preserve legitimate interest. We hold, therefore, that Article XVII is valid on its face and does not constitute an impermissible prior restraint on First Amendment freedoms.
 II
The next question is whether Article XVII is unconstitutional as applied to the instant facts. In Smith v. City ofMontgomery, supra, United States District Judge, Frank M. Johnson, Jr., pointed out that a city ordinance, such as we presently have before us, may be valid on its face and yet effect a denial of equal rights through its application under the facts of a particular case. In Smith, Ordinance No. 22-65, a predecessor to Article XVII, was held unconstitutional as applied to a group of pickets, at no time greater than six in number, who were orderly and well spaced. "[N]o one was prevented from entering or leaving the premises being picketed. There were no crowds; there was no disorder on the part of others and no threats of such disorder." 251 F. Supp. at 850. Judge Johnson ruled that under the facts in Smith, supra, "simple notice to the city officials was sufficient. It is unreasonable in these particular instances to require a formal application and await formal action on the part of the city commissioners." 251 F. Supp. at 851.
The situation in the case sub judice is a far cry from the situation in Smith, supra. Here, official intelligence reports revealed that approximately two hundred persons armed with ax handles, pick axes, hoe handles, bows and arrows, shotguns and rifles were marching "to the Capitol of Montgomery" and that a Klansman in the group was quoted as saying, "We will destroy the enemy on our march." It was anticipated that the mobilization of the National Guard might be required to assure the safety of police officers and the public.
Protection, not only for the public, but for Klan members was of concern to city officials. Anxiety over the safety and welfare of all individuals involved, both the marchers and the public, was not unfounded. A highly sensitive and potentially explosive situation was present.
Under the circumstances, simple notice to the city officials that a march was going to take place would not have been sufficient or realistic. Obviously, arrangements had to be made to prevent jeopardizing public safety and welfare; any contrary evaluation would demonstrate a reckless indifference to the value of human life and public property. Such indifference cannot be licensed under the guise of First Amendment freedom. In conclusion, we reiterate that other Ku Klux Klan groups were granted two parade permits in 1979, after making timely application for permits and there is no evidence that Article XVII was applied discriminatorily. Therefore, a formal application for a parade permit under these facts was not unreasonable. Article XVII was not unconstitutionally applied.
 III
The time requirements of Ordinance No. 100-76, which must be read in conjunction with Article XVII, were not unreasonable. Article XVII requires that a permit be obtained in order to parade, make procession or other public demonstration on the streets or other public ways of the City of Montgomery. Ordinance No. 100-76 requires that application for such permit be filed with the City Clerk no later than 12:00 noon, Friday preceding the next City Council meeting. Council meetings are held on Tuesday nights. In other words, to comply with Ordinance No. 100-76 in conjunction with Article XVII, any assemblage seeking a parade permit, where one is in fact required, must apply for such permit at least four days in advance of the planned parade, procession or other public demonstration, etc. This assumes that the application is filed at 12:00 noon Friday; the City Council grants or issues the permit to parade, etc., Tuesday night; and that the actual parade, etc., is held later that same Tuesday night. At any rate, a minimum of four days must elapse between the time application is filed and the parade is held. On the other hand, *Page 184 
in the normal course of City business as many as eleven days could be required to elapse between filing application and actual parading. This situation assumes that a parade, etc., is desired for Tuesday afternoon preceding a City Council meeting later that night. Application would have to be filed on Friday by 12:00 noon; the City Council would have to grant the permit four days later on Tuesday night; and the actual parade would be held the following Tuesday afternoon seven days later. So, in the normal course of City affairs, in situations where a permit is required (where simple notice is insufficient), a group desiring to parade is faced with a four-day minimum and an eleven-day maximum between the time they file application and the time they actually parade, etc.
The appellant's situation fell or could have fallen somewhere between the minimum and maximum periods. Sunday, August 12, 1979 was the date of the proposed parade. Twelve o'clock noon on Friday, August 3, 1979, based on Ordinance 100-76, was the latest time appellant's application for parade permit could have been filed for consideration by the City Council the following Tuesday night, August 7, 1979. In other words, the appellants here would have had to wait nine days between filing application for permit and parading. We do not feel this time period to be so unreasonable as to be labeled an illegal prior restraint on First Amendment guarantees.
The Supreme Court of the United States has held that a state is prohibited from requiring unduly cumbersome and time-consuming procedures before it may allow the exercise of the constitutional right of expression. Freedman v. Maryland,380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). The Freedman
principle has been held applicable in assembly cases. York v.City of Danville, 207 Va. 665, 152 S.E.2d 259 (1967);Progressive Labor Party v. Lloyd, 487 F. Supp. 1054, (D.Mass. 1980); Houston Peace Coalition v. Houston City Council,310 F. Supp. 457, (S.D.Tex. 1970).
The concerns and responsibilities of the Montgomery City Council in preparing for a parade were legitimate ones. In light of the serious and perhaps irreparable consequences which could likely be expected to flow from an ill-prepared and planned parade, the time limitations and requirements of Ordinance No. 110-76 are reasonable. Advance notice and planning for the type parade desired here was necessary to preserve public order and welfare. Concern for human life must be of paramount consideration when balanced with the right to parade. The elimination of haphazard and ill-thought-out planning for such events requires time. The time limitations here were reasonable in light of the circumstances.
 IV
Appellant need not be guilty of other criminal offenses to be in violation of Article XVII of the Montgomery Traffic Code.
In summary, we find Article XVII to be constitutional on its face and as applied to these appellants. Moreover, we find the time limitations imposed by Ordinance 100-76 to be reasonable. The Montgomery Circuit Court's judgment of conviction for these appellants is, therefore due to be affirmed. We note, however, that the maximum fine allowed by Article XVII is two-hundred ($200.00) dollars. See § 17-16, supra. These causes, therefore, are remanded to the circuit court for determination of proper fine under § 17-16 of Article XVII of the Montgomery Traffic Code.
AFFIRMED; REMANDED FOR PROPER SENTENCING.
All the Judges concur. *Page 185