# SHUTTLESWORTH *v.* CITY OF BIRMINGHAM.

No. 42.   Argued November 18, 1968.—Decided March 10, 1969.

*Jack Greenberg* argued the cause for petitioner. With him on the brief were *James M. Nabrit III, Norman C. Amaker, Charles Stephen Ralston, Melvyn Zarr, Arthur D. Shores, Orzell Billingsley, Jr.,* and *Anthony G. Amsterdam.*

*Earl McBee* argued the cause for respondent. With him on the brief were *J. M. Breckenridge* and *William C. Walker.*

MR. JUSTICE STEWART delivered the opinion of the Court.

The petitioner stands convicted for violating an ordinance of Birmingham, Alabama, making it an offense to participate in any "parade or procession or other public demonstration" without first obtaining a permit from the City Commission. The question before us is whether that conviction can be squared with the Constitution of the United States.

On the afternoon of April 12, Good Friday, 1963, 52 people, all Negroes, were led out of a Birmingham church by three Negro ministers, one of whom was the petitioner, Fred L. Shuttlesworth. They walked in orderly fashion, two abreast for the most part, for four

blocks. The purpose of their march was to protest the alleged denial of civil rights to Negroes in the city of Birmingham. The marchers stayed on the sidewalks except at street intersections, and they did not interfere with other pedestrians. No automobiles were obstructed, nor were traffic signals disobeyed. The petitioner was with the group for at least part of this time, walking alongside the others, and once moving from the front to the rear. As the marchers moved along, a crowd of spectators fell in behind them at a distance. The spectators at some points spilled out into the street, but the street was not blocked and vehicles were not obstructed.

At the end of four blocks the marchers were stopped by the Birmingham police, and were arrested for violating § 1159 of the General Code of Birmingham. That ordinance reads as follows:

"It shall be unlawful to organize or hold, or to assist in organizing or holding, or to take part or participate in, any parade or procession or other public demonstration on the streets or other public ways of the city, unless a permit therefor has been secured from the commission.

"To secure such permit, written application shall be made to the commission, setting forth the probable number of persons, vehicles and animals which will be engaged in such parade, procession or other public demonstration, the purpose for which it is to be held or had, and the streets or other public ways over, along or in which it is desired to have or hold such parade, procession or other public demonstration. The commission shall grant a written permit for such parade, procession or other public demonstration, prescribing the streets or other public ways which may be used therefor, unless in its judgment the public welfare, peace, safety, health, decency, good order, morals or convenience require that it be

refused.  It shall be unlawful to use for such pur-
poses any other streets or public ways than those set
out in said permit.

"The two preceding paragraphs, however, shall
not apply to funeral processions."

The petitioner was convicted for violation of § 1159
and was sentenced to 90 days' imprisonment at hard
labor and an additional 48 days at hard labor in default
of payment of a $75 fine and $24 costs.  The Alabama
Court of Appeals reversed the judgment of conviction,
holding the evidence was insufficient "to show a pro-
cession which would require, under the terms of § 1159,
the getting of a permit," that the ordinance had been
applied in a discriminatory fashion, and that it was
unconstitutional in imposing an "invidious prior re-
straint" without ascertainable standards for the granting
of permits.  43 Ala. App. 68, ——, ——, 180 So. 2d 114,
139, 127.  The Supreme Court of Alabama, however,
giving the language of § 1159 an extraordinarily narrow
construction, reversed the judgment of the Court of
Appeals and reinstated the conviction.  281 Ala. 542,
206 So. 2d 348.  We granted certiorari to consider the
petitioner's constitutional claims.  390 U. S. 1023.

There can be no doubt that the Birmingham ordinance,
as it was written, conferred upon the City Commission
virtually unbridled and absolute power to prohibit any
"parade," "procession," [1] or "demonstration" on the city's
streets or public ways.  For in deciding whether or not
to withhold a permit, the members of the Commission
were to be guided only by their own ideas of "public
welfare, peace, safety, health, decency, good order, morals
or convenience."  This ordinance as it was written, there-
fore, fell squarely within the ambit of the many decisions
of this Court over the last 30 years, holding that a law
subjecting the exercise of First Amendment freedoms to

---

[1] Except funeral processions.

the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional.[2] "It is settled by a long line of recent decisions of this Court that an ordinance which, like this one, makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms." *Staub* v. *Baxley,* 355 U. S. 313, 322. And our decisions have made clear that a person faced with such an unconstitutional licensing law may ignore it and engage with impunity in the exercise of the right of free expression for which the law purports to require a license.[3] "The Constitution can hardly be thought to deny to one subjected to the restraints of such an ordinance the right to attack its constitutionality, because he has not yielded to its demands." *Jones* v. *Opelika,* 316 U. S. 584, 602 (Stone, C. J., dissenting), adopted *per curiam* on rehearing, 319 U. S. 103, 104.

---

[2] See *Lovell* v. *Griffin,* 303 U. S. 444; *Hague* v. *C. I. O.,* 307 U. S. 496; *Schneider* v. *State,* 308 U. S. 147, 163–165; *Cantwell* v. *Connecticut,* 310 U. S. 296; *Largent* v. *Texas,* 318 U. S. 418; *Jones* v. *Opelika,* 316 U. S. 584, 600 (Stone, C. J., dissenting), 611 (Murphy, J., dissenting), vacated and previous dissenting opinions adopted *per curiam,* 319 U. S. 103; *Marsh* v. *Alabama,* 326 U. S. 501; *Tucker* v. *Texas,* 326 U. S. 517; *Saia* v. *New York,* 334 U. S. 558; *Kunz* v. *New York,* 340 U. S. 290; *Niemotko* v. *Maryland,* 340 U. S. 268; *Joseph Burstyn, Inc.* v. *Wilson,* 343 U. S. 495; *Gelling* v. *Texas,* 343 U. S. 960; *Superior Films, Inc.* v. *Department of Education,* 346 U. S. 587; *Staub* v. *Baxley,* 355 U. S. 313; *Cox* v. *Louisiana,* 379 U. S. 536; *Interstate Circuit, Inc.* v. *Dallas,* 390 U. S. 676.

[3] *Lovell* v. *Griffin,* 303 U. S., at 452–453; *Schneider* v. *State,* 308 U. S., at 159, 165; *Largent* v. *Texas,* 318 U. S., at 419, 422; *Jones* v. *Opelika,* 316 U. S., at 602 (Stone, C. J., dissenting), adopted *per curiam* on rehearing, 319 U. S., at 104; *Staub* v. *Baxley,* 355 U. S., at 319; *Freedman* v. *Maryland,* 380 U. S. 51, 56–57.

It is argued, however, that what was involved here was not "pure speech," but the use of public streets and sidewalks, over which a municipality must rightfully exercise a great deal of control in the interest of traffic regulation and public safety. That, of course, is true. We have emphasized before this that "the First and Fourteenth Amendments [do not] afford the same kind of freedom to those who would communicate ideas by conduct such as patrolling, marching, and picketing on streets and highways, as these amendments afford to those who communicate ideas by pure speech." *Cox* v. *Louisiana,* 379 U. S. 536, 555. "Governmental authorities have the duty and responsibility to keep their streets open and available for movement." *Id.,* at 554–555.

But our decisions have also made clear that picketing and parading may nonetheless constitute methods of expression, entitled to First Amendment protection. *Cox* v. *Louisiana, supra; Edwards* v. *South Carolina,* 372 U. S. 229; *Thornhill* v. *Alabama,* 310 U. S. 88. "Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied." *Hague* v. *C. I. O.,* 307 U. S. 496, 515–516 (opinion of Mr. Justice Roberts, joined by MR. JUSTICE BLACK).

Accordingly, "[a]lthough this Court has recognized that a statute may be enacted which prevents serious interference with normal usage of streets and parks, . . . we have consistently condemned licensing systems which vest in an administrative official discretion to grant or withhold a permit upon broad criteria unrelated to proper regulation of public places." *Kunz* v. *New York,* 340 U. S. 290, 293–294. See also *Saia* v. *New York,* 334 U. S. 558; *Niemotko* v. *Maryland,* 340 U. S. 268. Even when the use of its public streets and sidewalks is involved, therefore, a municipality may not empower its licensing officials to roam essentially at will, dispensing or withholding permission to speak, assemble, picket, or parade, according to their own opinions regarding the potential effect of the activity in question on the "welfare," "decency," or "morals" of the community.

Understandably, under these settled principles, the Alabama Court of Appeals was unable to reach any conclusion other than that § 1159 was unconstitutional. The terms of the Birmingham ordinance clearly gave the City Commission extensive authority to issue or refuse to issue parade permits on the basis of broad criteria entirely unrelated to legitimate municipal regulation of the public streets and sidewalks.

It is said, however, that no matter how constitutionally invalid the Birmingham ordinance may have been as it was written, nonetheless the authoritative construction that has now been given it by the Supreme Court of Alabama has so modified and narrowed its terms as to render it constitutionally acceptable. It is true that in affirming the petitioner's conviction in the present case, the Supreme Court of Alabama performed a remarkable job of plastic surgery upon the face of the ordinance. The court stated that when § 1159 provided that the City Commission could withhold a permit whenever "in its

judgment the public welfare, peace, safety, health, decency, good order, morals or convenience require," the ordinance really meant something quite different:

> "[W]e do not construe this [language] as vesting in the Commission an unfettered discretion in granting or denying permits, but, in view of the purpose of the ordinance, one to be exercised in connection with the safety, comfort and convenience in the use of the streets by the general public. . . . The members of the Commission may not act as censors of what is to be said 'or displayed in any parade. . . .

> .  .  .  .  .

> ". . . [We] do not construe § 1159 as conferring upon the 'commission' of the City of Birmingham the right to refuse an application for a permit to carry on a parade, procession or other public demonstration solely on the ground that such activities might tend to provoke disorderly conduct. . . .

> "We also hold that under § 1159 the Commission is without authority to act in an arbitrary manner or with unfettered discretion in regard to the issuance of permits. Its discretion must be exercised with uniformity of method of treatment upon the facts of each application, free from improper or inappropriate considerations and from unfair discrimination. A systematic, consistent and just order of treatment with reference to the convenience of public use of the streets and sidewalks must be followed. Applications for permits to parade must be granted if, after an investigation it is found that the convenience of the public in the use of the streets or sidewalks would not thereby be unduly disturbed." 281 Ala., at 545–546, 206 So. 2d, at 350–352.

In transforming § 1159 into an ordinance authorizing no more than the objective and even-handed regulation

of traffic on Birmingham's streets and public ways, the Supreme Court of Alabama made a commendable effort to give the legislation "a field of operation within constitutional limits." 281 Ala., at 544, 206 So. 2d, at 350. We may assume that this exercise was successful, and that the ordinance as now authoritatively construed would pass constitutional muster.[4] It does not follow, however, that the severely narrowing construction put upon the ordinance by the Alabama Supreme Court in November of 1967 necessarily serves to restore constitutional validity to a conviction that occurred in 1963 under the ordinance as it was written. The inquiry in every case must be that stated by Chief Justice Hughes in *Cox v. New Hampshire,* 312 U. S. 569—whether control of the use of the streets for a parade or procession was, in fact, "exerted so as not to deny or unwarrantedly abridge the right of assembly and the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places." *Id.,* at 574.

In *Cox* the Court found that control of the streets had not been exerted unconstitutionally. There the Court was dealing with a parade-permit statute that was silent as to the criteria governing the granting of permits. In affirming the appellants' convictions for parading without a permit, the New Hampshire Supreme Court had construed the statute to require the issuance of a permit to anybody who applied, subject only to the power of the licensing authority to specify the "time, place and manner" of the parade in order to accommodate com-

---

[4] The validity of this assumption would depend upon, among other things, the availability of expeditious judicial review of the Commission's refusal of a permit. Cf. *Poulos* v. *New Hampshire,* 345 U. S. 395, 420 (Frankfurter, J., concurring in result); *Freedman* v. *Maryland,* 380 U. S. 51. See also the concurring opinion of MR. JUSTICE HARLAN, *post,* p. 159.

peting demands for public use of the streets. This Court accepted the state court's characterization of the statute, and its assurance that the appellants " 'had a right, under the Act, to a license to march when, where and as they did, if after a required investigation it was found that the convenience of the public in the use of the streets would not thereby be unduly disturbed, upon such conditions or changes in time, place and manner as would avoid disturbance.' " 312 U. S., at 576. In affirming the New Hampshire judgment, however, this Court was careful to emphasize:

> "There is no evidence that the statute has been administered otherwise than in the fair and non-discriminatory manner which the state court has construed it to require." *Id.*, at 577.

In the present case we are confronted with quite a different situation. In April of 1963 the ordinance that was on the books in Birmingham contained language that affirmatively conferred upon the members of the Commission absolute power to refuse a parade permit whenever they thought "the public welfare, peace, safety, health, decency, good order, morals or convenience require that it be refused." It would have taken extraordinary clairvoyance for anyone to perceive that this language meant what the Supreme Court of Alabama was destined to find that it meant more than four years later; and, with First Amendment rights hanging in the balance, we would hesitate long before assuming that either the members of the Commission or the petitioner possessed any such clairvoyance at the time of the Good Friday march.

But we need not deal in assumptions. For, as the respondent in this case has reminded us, in assessing the constitutional claims of the petitioner, "[i]t is less than realistic to ignore the surrounding relevant circumstances.

These include not only facts developed in the Record in this case, but also those shown in the opinions in the related case of *Walker* v. *City of Birmingham* (1967), 388 U. S. 307 . . . ."[5] The petitioner here was one of the petitioners in the *Walker* case, in which, just two Terms ago, we had before us a record showing many of the "surrounding relevant circumstances" of the Good Friday march. As the respondent suggests, we may properly take judicial notice of the record in that litigation between the same parties who are now before us.[6]

Uncontradicted testimony was offered in *Walker* to show that over a week before the Good Friday march petitioner Shuttlesworth sent a representative to apply for a parade permit. She went to the City Hall and asked "to see the person or persons in charge to issue permits, permits for parading, picketing, and demonstrating." She was directed to Commissioner Connor, who denied her request in no uncertain terms. "He said, 'No, you will not get a permit in Birmingham, Alabama to picket. I will picket you over to the City Jail,' and he repeated that twice." 388 U. S., at 317, n. 9, 325, 335, 339.

Two days later petitioner Shuttlesworth himself sent a telegram to Commissioner Connor requesting, on behalf of his organization, a permit to picket "against the injustices of segregation and discrimination." His request specified the sidewalks where the picketing would take place, and stated that "the normal rules of picketing" would be obeyed. In reply, the Commissioner sent a wire stating that permits were the responsibility of the entire Commission rather than of a single Commissioner, and closing with the blunt admonition: "I insist that you

---

[5] Brief for Respondent 1–2.

[6] *National Fire Ins. Co.* v. *Thompson*, 281 U. S. 331, 336, and cases cited therein.

and your people do not start any picketing on the streets in Birmingham, Alabama." *Id.*, at 318, n. 10, 325, 335–336, 339–340.[7]

These "surrounding relevant circumstances" make it indisputably clear, we think, that in April of 1963—at least with respect to this petitioner and his organization[8]—the city authorities thought the ordinance meant exactly what it said. The petitioner was clearly given to understand that under no circumstances would he and his group be permitted to demonstrate in Birmingham, not that a demonstration would be approved if a time and place were selected that would minimize traffic problems. There is no indication whatever that the authorities considered themselves obligated—as the Alabama Supreme Court more than four years later said that they were—to issue a permit "if, after an investigation [they] found that the convenience of the public in the use of the streets or sidewalks would not thereby be unduly disturbed."

This case, therefore, is a far cry from *Cox* v. *New Hampshire, supra,* where it could be said that there was

---

[7] The legal and constitutional issues involved in the *Walker* case were quite different from those involved here. The Court recently summarized the *Walker* decision as follows:

"In that case, the Court held that demonstrators who had proceeded with their protest march in face of the prohibition of an injunctive order against such a march, could not defend contempt charges by asserting the unconstitutionality of the injunction. The proper procedure, it was held, was to seek judicial review of the injunction and not to disobey it, no matter how well-founded their doubts might be as to its validity." *Carroll* v. *President and Commissioners of Princess Anne,* 393 U. S. 175, 179.

[8] In *Walker* the petitioner made an offer of proof that parade permits had been issued to other groups by the city clerk at the request of the traffic bureau of the police department. 388 U. S., at 325–326, 336, 340.

nothing to show "that the statute has been administered otherwise than in the . . . manner which the state court has construed it to require." Here, by contrast, it is evident that the ordinance was administered so as, in the words of Chief Justice Hughes, "to deny or unwarrantedly abridge the right of assembly and the opportunities for the communication of thought . . . immemorially associated with resort to public places." The judgment is

*Reversed.*

MR. JUSTICE BLACK concurs in the result.

MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

MR. JUSTICE HARLAN, concurring.

The Alabama Supreme Court's opinion makes it clear that if petitioner Shuttlesworth had carried his efforts to obtain a parade permit to the highest state court, he could have required the city authorities to grant permission for his march, so long as his proposals were consistent with Birmingham's interest in traffic control. Thus, the difficult question this case presents is whether the Fourteenth Amendment ever bars a State from punishing a citizen for marching without a permit which could have been procured if all available remedies had been pursued.

The Court answers that a citizen is entitled to rely on the statutory construction adopted by the state officials who are on the front line, administering the permit scheme. If these officials construe a vague statute unconstitutionally, the citizen may take them at their word, and act on the assumption that the statute is void. The Court's holding seems to me to carry seeds of mischief that may impair the conceded ability of the authorities to regulate the use of public thoroughfares in the interests of

all. The right to ignore a permit requirement should, in my view, be made to turn on something more substantial than a minor official's view of his authority under the governing statute.

Simply because an inferior state official indicates his view as to a statute's scope, it does not follow that the State's judiciary will come to the same conclusion. Situations do exist, however, in which there can be no effective review of the decision of an inferior state official. In the present case, for example, the decision of Commissioner Connor had the practical effect of the decision of a court of last resort. One week before the Good Friday march, Shuttlesworth learned from Connor that he, as Commissioner of Public Safety, would not issue parade permits, and that the marchers would have to apply to the entire City Commission.[1] But Birmingham's ordinances did not require a prompt decision by

---

[1] I agree with my Brother STEWART that we may properly take judicial notice of the evidence of record in *Walker* v. *Birmingham*, 388 U. S. 307 (1967). See 9 J. Wigmore, Evidence § 2579, at 570 (3d ed. 1940); *Butler* v. *Eaton*, 141 U. S. 240 (1891); *Craemer* v. *Washington*, 168 U. S. 124 (1897). That record shows that in response to a request for permission to march on April 5 and 6, Mr. Connor replied by telegram on April 5:

"Under the provisions of the city code of the City of Birmingham, a permit to picket as requested by you cannot be granted by me individually but is the responsiboity [*sic*] of the entire commission. I insist that you and your people do not start any picketing on the streets in Birmingham, Alabama.

"Eugene 'Bull' Connor, Commissioner of Public Safety."

See *Walker* v. *Birmingham*, No. 249, October Term, 1966, Transcript of Record 415. Mr. Connor's telegram was received in evidence at trial. See Transcript, *supra*, at 350.

I do not, however, find it appropriate to rely upon the slightly earlier episode detailed in my Brother STEWART's opinion, *ante*, at 157, as the trial judge ruled the uncontradicted supporting testimony inadmissible. See Transcript, *supra*, at 355.

the City Commission.[2]   Nor did the State of Alabama
provide for a speedy court review of the denial of a
parade permit.[3]

Given the absence of speedy procedures, the Reverend
Shuttlesworth and his associates were faced with a seri-
ous dilemma when they received their notice from
Mr. Connor.   If they attempted to exhaust the admin-
istrative and judicial remedies provided by Alabama
law, it was almost certain that no effective relief could
be obtained by Good Friday.   Since the right to engage
in peaceful and orderly political demonstrations is, under
appropriate conditions, a fundamental aspect of the
"liberty" protected by the Fourteenth Amendment, see
*Stromberg* v. *California*, 283 U. S. 359, 368–370 (1931);
*Hague* v. *C. I. O.*, 307 U. S. 496, 515–516 (1939) (opinion
of Roberts, J.); *Garner* v. *Louisiana*, 368 U. S. 157,
201–203 (1961) (opinion of HARLAN, J.), the petitioner
was not obliged to invoke procedures which could
not give him effective relief.   With fundamental rights
at stake, he was entitled to adopt the more probable
meaning of the ordinance and act on his belief that the
city's permit regulations were unconstitutional.

---

[2] Section 1159 does not require the City Commission to act on
an application within any fixed amount of time.   Indeed, by the
time Connor definitively declared that he could not issue parade
permits, it is not at all clear that petitioner could even have made
a timely permit application to the City Commission at its only
remaining regular session set before the scheduled Good Friday
march.   See General City Code of Birmingham § 21 (1944).   While
the 1964 City Code makes it clear that petitioner's permit applica-
tion would have been considered out of time, see § 2–10, the 1944
Code, which was applicable in 1963, is not clear on this point.

[3] Although Shuttlesworth could have petitioned for a writ of
mandamus in the Alabama Circuit Court if the City Commission
denied his application, that state court is not obliged to render
a decision within any fixed period of time.

It may be suggested, however, that Shuttlesworth's dilemma was of his own making. He could have requested a permit months in advance of Good Friday, thereby allowing Alabama's administrative and judicial machinery the necessary time to operate fully before the date set for the march. But such a suggestion ignores the principle established in *Freedman* v. *Maryland,* 380 U. S. 51, 58–61 (1965), which prohibits the States from requiring persons to invoke unduly cumbersome and time-consuming procedures before they may exercise their constitutional right of expression. *Freedman* holds that if the State is to protect the public from obscene movies, it must afford exhibitors a speedy administrative or judicial right of review, lest "the victorious exhibitor might find the most propitious opportunity for exhibition [passed]." *Id.,* at 61. The *Freedman* principle is applicable here.[4] The right to assemble peaceably to voice political protest is at least as basic as the right to exhibit a motion picture which may have some aesthetic value. Moreover, slow-moving procedures have a much more severe impact in the instant case

---

[4] None of our past decisions have squarely considered whether parade licenses must be handled on an expedited basis. In *Cox* v. *New Hampshire,* 312 U. S. 569 (1941), the question was not argued. In *Poulos* v. *New Hampshire,* 345 U. S. 395 (1953), Poulos' request for a permit to conduct religious services in a public park was refused by the Portsmouth City Council seven and one-half weeks before the first scheduled event. Since the time remaining was sufficient to obtain relief by way of mandamus, see 345 U. S., at 419–420 (opinion of Mr. Justice Frankfurter), there was no need to consider whether the State had a constitutional obligation to provide a more rapid procedure. And, of course, those cases which struck down regulatory schemes which purported to issue licenses on the basis of unconstitutional standards did not reach the question presented here. See, *e. g., Lovell* v. *Griffin,* 303 U. S. 444 (1938); *Schneider* v. *State,* 308 U. S. 147, 163–165 (1939); *Largent* v. *Texas,* 318 U. S. 418 (1943); *Staub* v. *Baxley,* 355 U. S. 313 (1958).

than they had in *Freedman.* Though a movie exhibitor might suffer some financial loss if he were obliged to wait for a year or two while the administrative and judicial mills ground out a result, it is nevertheless quite likely that the public would ultimately see the film. In contrast, timing is of the essence in politics. It is almost impossible to predict the political future; and when an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all. To require Shuttlesworth to submit his parade permit application months in advance would place a severe burden upon the exercise of his constitutionally protected rights. Cf. *Williams* v. *Rhodes,* 393 U. S. 23, 33 (1968).

I do not mean to suggest that a State or city may not reasonably require that parade permit applications be submitted early enough to allow the authorities and the judiciary to determine whether the parade proposal is consistent with the important interests respecting the use of the streets which local authority may legitimately protect. But such applications must be handled on an expedited basis so that rights of political expression will not be lost in a maze of cumbersome and slow-moving procedures.

Neither the city of Birmingham nor the State of Alabama has established such expedited procedures. See nn. 2 and 3, *supra.* Indeed, the city's parade ordinance does not establish any procedure at all to govern the consideration of applications. Section 1159 of the City Code does not state *when* an application must be submitted if it is to be considered timely. The ordinance does not state *how* an application is to be submitted to the "City Commission." [5] Nor have

_____

[5] It would be most remarkable if every parade application involving the march of 52 persons is considered in a plenary manner by the principal governmental body of a city so large as Birmingham. In fact, an offer of proof was made in the *Walker* proceedings that

regulations been published which would answer these questions.[6]

In the absence of any guidelines, the most that can fairly be asked of petitioner is that he make a good-faith effort to obtain a permit from the city authorities. Shuttlesworth so acted when he approached the city official most likely to have the authority to deal with permit applications in an expedited manner—Commissioner Connor was the member of the City Commission in charge of public safety. It was Connor, not Shuttlesworth, who broke off all discussions relating to the issuance of permits. After the Commissioner declared that he lacked the power to act, it was reasonable to believe that no public authority would act in time. Since neither the city nor the State provided sufficiently expedited procedures for the consideration of parade permits, petitioner Shuttlesworth cannot be punished for the exercise of his constitutionally protected right of political expression.[7]

On this basis I concur in the reversal of the judgment of the Alabama Supreme Court.

---

the City Commission had never passed on permit applications in the past, but had delegated the task to inferior officials. See Transcript, *supra*, n. 1, at 290. The proof was not admitted on the ground that it was irrelevant. *Ibid.*

[6] At the trial in *Walker* v. *Birmingham,* the City Clerk, who kept records of the parade permits that had been granted, stated that no regulations had been issued to fill in the gaps left by the Ordinance. See Transcript, *supra,* n. 1, at 286.

[7] I do not reach the question whether the principle followed in such cases as *Lovell, Schneider, Largent,* and *Staub,* see n. 4, *supra,* allowing persons to ignore entirely licensing schemes which unconstitutionally impinge on other forms of free expression, should be extended to cover "parade" permit statutes involving, as they do, a particularly important state interest.