**TJ'S SOUTH, INC., Plaintiff,**

v.

**The TOWN OF LOWELL, et al., Defendants.**

**No. 2:94–CV–203.**

United States District Court, N.D. Indiana, Hammond Division.

Aug. 4, 1995.

Jamie Golden Sypulski, Law Offices of Gerhard E.W. Kelter, Jr., Chicago, IL, for plaintiff.

Bruce P. Clark, Bruce P. Clark and Associates, Munster, IN, Mary K. McGahey, Merlo, Kanofsky, and Brinkmeier, Chicago, IL, James L. Clement, Jr., Hoeppner, Wager & Evans, Merrillville, IN, for defendants.

## ORDER

LOZANO, District Judge.

This matter is before the Court on the following motions: Plaintiff's Motion for Partial Summary Judgment filed on June 13, 1995; Defendant's Motion for Summary Judgment filed on June 13, 1995; Defen-

dants' Motion to Strike Paragraphs 5 and 12 From the Affidavit of John T. Toma filed June 28, 1995; and Defendants' Motion to Strike the Affidavit of James P. Hunt filed June 28, 1995. For the reasons set forth below, Plaintiff's Motion for Partial Summary Judgment is **GRANTED IN PART** and **DENIED IN PART,** Defendants' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART,** and the Motions to Strike are **DENIED.**

## BACKGROUND

Plaintiff, TJ's South, Inc. ("TJ's") currently operates a tavern in Lowell, Indiana. Defendants are The Town of Lowell ("Lowell"), The Lowell Town Council ("Council"), The Lowell Board of Zoning Appeals ("Board"), and individual members of the Council and the Board (the individuals are all sued in their official capacities). TJ's claims constitutional violations arising from the Lowell zoning ordinance and zoning decisions by Defendants. The parties have filed cross-motions for summary judgment.

The following facts are uncontroverted: The Zoning Ordinance of the Town of Lowell ("Lowell ordinance" or "ordinance") provides that property in Lowell will be divided into fifteen types of districts. Ord. § 17.12.020. The ordinance also generally provides which types of "uses" are permitted in each type of district. "Eating and drinking establishments" are a permitted use in four of the district types. Ord. §§ 17.16.060, 17.16.070, 17.16.080, 17.16.085. The ordinance does not define "eating and drinking establishment," but the parties appear to agree that TJ's fits the term.

No matter which district type it locates in, an eating-and-drinking establishment cannot present "entertainment" without first obtaining a "special exception," in essence, permission from the Council. *Id.* §§ 17.16.060, 17.16.070, 17.16.080, 17.16.085, 17.16.150. Before an amendment to the ordinance in March 1994, the term "entertainment" was not defined in the ordinance.[1] The amendment added a definition of "entertainment" that includes (but is not limited to) "musical

performances such as bands, disc jockeys, comedians, and square dance calling." Ord. No. 1994–5.

Theaters and recreation halls are permitted uses only in the same four district types that permit eating-and-drinking establishments. *See* Ord. §§ 17.16.010–140. Theaters and recreations halls need not obtain a special exception to present entertainment. The ordinance does not define "theater" or "recreation hall." At present, no business that one would typically call a theater exists in Lowell, and no ostensible recreation hall "seek[s] to provide live entertainment." (Hatch Aff. ¶ 3) Besides eating-and-drinking establishments, theaters, and recreation halls, neither party has identified any other permitted use that might typically present entertainment for profit.

The ordinance, supplemented by state statute and established practices in Lowell, sets forth a procedure and standards for obtaining a special exception. First, the property owner must file a written application with the Board. The application must

> set[ ] forth such information as may be required by the [Board] so as to determine whether the grant of such a special exception will be consistent with the underlying goals and philosophy of [the Lowell zoning ordinance], whether there would be an adverse effect on the general health, safety, and welfare of the inhabitants of [Lowell], and whether or not the granting of such a special exception would be authorized by law.

Ord. § 17.16.150.B. Lowell officials supply applicants with a form application.

The Board holds a public hearing on the application. After the hearing, the Board recommends to the Council whether the special exception should be denied or granted, and must do so in writing. If the Board recommends a denial, it must "set forth the specific reasons for such denial." Ord. § 17.16.150.B. The Board may recommend that the special exception be granted subject to "conditions and safeguards." *Id.* The

---

1. The parties appear to debate the effective date of this amendment, a debate that has no bearing on this order.

parties have not identified any provision of the ordinance that limits what conditions and safeguards the Board and Council have authority to require, although one provision suggests that possible special exception conditions include but are not limited to ensuring adequate off-street parking and loading zones. *Id.* § 17.16.150.D. The Board may recommend granting a special exception for a limited time period, apparently of any length. *Id.* § 17.16.150.E.

After receiving the Board's recommendation, the Council votes on whether to grant the special exception. The applicant may petition for review of the Council's decision in the state trial court and appeal that court's decision.

The ordinance sets forth a standard for the Board and Council to follow in deciding whether to grant a special exception: "No special exception shall be granted . . . unless the special exception (1) Is necessary for the public convenience at that location and is designed, located, and intended to be operated so that the public health, safety, and welfare will be protected; [and] (2) will not cause potential injury to the value of other property in the neighborhood in which it is located." Ord. § 17.16.150.C.

TJ's first-hand experience with this permit scheme is the impetus for this lawsuit. Sometime in May 1993, TJ's submitted to the Board a written application for a special exception that would allow TJ's to feature live entertainment such as disc jockeys, bands, and dancing in its tavern. On May 20, 1993, the Board held a public hearing on the application. Minutes of that hearing reflect that the Board decided to forward TJ's application to the Council with an unfavorable recommendation. Apparently at or soon after the hearing, the Board issued "written determinations" constituting an unfavorable recommendation. Four days later, the Council voted to deny the application.

A little over three months later, TJ's opened its tavern for business. After roughly six more months went by, the Council amended the Lowell ordinance, adding the definition of "entertainment" set forth above. Proceeding under the amended ordinance, in April 1994 TJ's again submitted to the Board a written application for a special exception to present entertainment including bands, disc jockeys, and dancing. On April 21, 1994, the Board held a hearing on the application. Minutes of the hearing reflect that the Board decided to forward TJ's application to the Council with an unfavorable recommendation. Apparently at or soon after the hearing, the Board issued unfavorable written determinations on TJ's application. About two weeks later, the Council voted to deny TJ's special exception.

At a time not specified in the Complaint, another Lowell tavern called "Alaskan Pipeline" submitted to the Board a written application for a special exception to present live entertainment similar to that which TJ's sought to present. Alaskan Pipeline is located in a "planned business district" while TJ's is located in a "downtown business district." As with the TJ's application, the Board held a public hearing. On June 16, 1994, the Board issued a favorable recommendation. About ten days later, the Council voted to grant Alaskan Pipeline the special exception.

TJ's Complaint contains five counts, all advanced under 42 U.S.C. section 1983. TJ's claims essentially sound in the First Amendment, due process, and equal protection.

## DISCUSSION

As a threshold matter, the Court will address the Motions to Strike. Defendants have moved to strike portions of one affidavit submitted by TJ's and the entirety of another affidavit submitted by TJ's. Under Federal Rule of Civil Procedure 56(e), affidavits submitted in connection with a summary judgment motion must "be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Defendants' Motions to Strike do not require an extensive discussion, except to say that they rest on matters of witness credibility and an overzealous definition of what constitutes a legal conclusion. Accordingly, these Motions are **DENIED**.

 The standards governing summary judgment motions are familiar. Pursuant to Rule 56(c) of the Federal Rules of Civil Pro-

cedure, summary judgment is proper only if it is demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See Nebraska v. Wyoming,* — U.S. —, —, 113 S.Ct. 1689, 1694, 123 L.Ed.2d 317 (1993); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In other words, the record must reveal that no reasonable jury could find for the nonmovant. *Karazanos v. Navistar Int'l Transp. Corp.,* 948 F.2d 332, 335 (7th Cir.1991); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In deciding a motion for summary judgment, a court must read all facts in the light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513; *Nucor Corp. v. Aceros Y Maquilas de Occidente,* 28 F.3d 572, 583 (7th Cir.1994).

The burden is upon the moving party to identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, which it believes demonstrates an absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. Once the moving party has met this burden, the nonmoving party may not rest upon mere allegations but "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Becker v. Tenenbaum–Hill Assoc., Inc.,* 914 F.2d 107, 110 (7th Cir.1990); *Schroeder v. Lufthansa German Airlines,* 875 F.2d 613, 620 (7th Cir. 1989). "Whether a fact is material depends on the substantive law underlying a particular claim and 'only disputes over facts that *might affect the outcome* of the suit under governing law will properly preclude the entry of summary judgment.'" *Walter v. Fiorenzo,* 840 F.2d 427, 434 (7th Cir.1988) (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510).

■ "[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a *genuine* issue of material fact which requires trial." *Beard v. Whitley County REMC,* 840 F.2d 405, 410 (7th Cir.

1988); *see also Hickey v. A.E. Staley Mfg.,* 995 F.2d 1385, 1391 (7th Cir.1993). Therefore, if a party fails to establish the existence of an essential element of its case on which it bears the burden of proof at trial, summary judgment will be appropriate. In this situation, there can be "'no genuine issue as to any material fact', since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552.

### TJ's Summary Judgment Motion

As a threshold issue, the Court will proceed on the assumption that the live entertainment TJ's seeks to present—disc jockeys and bands—lies solidly within the ambit of First Amendment protection. Defendants have not argued to the contrary, which is not surprising given relevant case law. *See Ward v. Rock Against Racism,* 491 U.S. 781, 790, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989) ("Music, as a form of expression and communication, is protected under the First Amendment."); *Schad v. Borough of Mt. Ephraim,* 452 U.S. 61, 65, 101 S.Ct. 2176, 2181, 68 L.Ed.2d 671 (1981) ("[L]ive entertainment, such as musical and dramatic works fall within the First Amendment guarantee."). Defendants do allege that they have not *infringed on* TJ's First Amendment rights. Yet this argument is counterintuitive—after all, TJ's must ask permission from the Board and Council to present entertainment, and the Board and Council have twice refused to grant permission. Also, the argument does not hold up to the prior restraint analysis below.

### A. Prior Restraint

TJ's argues that the provisions of the ordinance requiring eating-and-drinking establishments to obtain a special exception to present entertainment embody a prior restraint on speech in violation of the First Amendment, and have done so both before and after the amendment that added the definition of "entertainment."[2] TJ's challenges these provisions on their face.

---

**2.** Despite some less-than-explicit captioning in

TJ's brief, the Court concludes that TJ's chal-

■■■ The defining feature of a "prior restraint" is that it gives a public official "the power to deny the use of a forum in advance of actual expression." *Ward*, 491 U.S. at 795 n. 5, 109 S.Ct. at 2756 n. 5 (quoting *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553, 95 S.Ct. 1239, 1244, 43 L.Ed.2d 448 (1975)). Thus, a government engages in a prior restraint when it requires citizens or businesses to obtain permission before making protected speech. *See id.*; *Stokes v. City of Madison*, 930 F.2d 1163, 1167 (7th Cir. 1991). Classic examples of prior restraints include requiring a citizen to obtain a permit to parade or speak on public property and requiring that films be passed by a censorship board before being shown at theaters. *See Forsyth County v. Nationalist Movement*, 505 U.S. 123, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992); *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). The Lowell ordinance requires TJ's to obtain permission, in the form of a special exception, from the Council (and to some extent the Board) before offering entertainment in its tavern. Therefore, the Lowell ordinance is a prior restraint on speech, and is subject to the constitutional limits on prior restraints. Indeed, prior restraints face a heavy presumption that they are unconstitutional. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225, 110 S.Ct. 596, 604, 107 L.Ed.2d 603 (1990).

In a facial challenge to a law, the plaintiff is not merely alleging that the law has been unconstitutionally applied to him or her; rather, the plaintiff argues that the law might be unconstitutionally applied to most anyone. As such, facial challenges involve a plaintiff asserting the rights of others, and for this reason, they are not the norm. *Forsyth County*, 505 U.S. at 129–31, 112 S.Ct. at 2401.

However, First Amendment law has carved out a place for facial challenges to prior restraints. A plaintiff can challenge a permit scheme on its face if the scheme "vests unbridled discretion in the government official over whether to permit or deny expressive activity." *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 755, 108 S.Ct. 2138, 2143, 100 L.Ed.2d 771 (1988). A facial challenge will lie whether or not the plaintiff has applied for a permit under the scheme at issue, and whether or not the scheme has been or could be constitutionally applied to the plaintiff. *Forsyth County*, 505 U.S. at 127–31, 133 n. 10, 112 S.Ct. at 2400–01, 2403 n. 10; *Lakewood*, 486 U.S. at 756, 764, 770 n. 11, 108 S.Ct. at 2143, 2147, 2151 n. 11. In this sense, the prior restraint doctrine perhaps has a prophylactic role.

With these key concepts outlined, the Court will now assess TJ's arguments. At its most fundamental level, the First Amendment restricts the government's ability to censor the speech of citizens based on the views expressed in the speech. *Police Dept. of City of Chicago v. Mosley*, 408 U.S. 92, 95, 92 S.Ct. 2286, 2289, 33 L.Ed.2d 212 (1972). Accordingly, prior restraint schemes that make it easy for an official to grant or deny speech permits based on speech content may violate the First Amendment. *FW/PBS*, 493 U.S. at 226, 110 S.Ct. at 605; *Graff v. City of Chicago*, 9 F.3d 1309, 1313 (7th Cir.1993) (plurality opinion), *cert. denied*, — U.S. ——, 114 S.Ct. 1837, 128 L.Ed.2d 464 (1994). A prior restraint scheme that allows an official to dispense permits without being guided by specific, viewpoint-neutral criteria may afford the official leeway to engage in prohibited censorship. *Forsyth County*, 505 U.S. at 131–32, 112 S.Ct. at 2402; *Lakewood*, 486 U.S. at 758, 760, 108 S.Ct. at 2144, 2145; *Graff*, 9 F.3d at 1316 (plurality opinion).

As an extreme example, a scheme that allowed an official to grant or deny permits wholly in the official's discretion, without providing any guidelines to control the decision or requiring the official to give reasons for the decision, would most likely represent an unconstitutional prior restraint. Not being constrained by guidelines, the official could conceivably decide on any basis, including speech viewpoint. *Graff*, 9 F.3d at 1332 (concurring opinion). Also, because the official need not give reasons for the unconstrained

---

lenges the ordinance as it stood both before and after the amendment. *See* Brief in Support of

Par. Sum. Judg. pp. 6, 15.

decisions, detecting whether the decision was based on viewpoint would be difficult. *Lakewood*, 486 U.S. at 758, 108 S.Ct. at 2144. In short, not constraining an official with guidelines or requiring reasons for decisions makes it possible for the official to deny permits based on unconstitutional and effectively unreviewable grounds. *Lakewood*, 486 U.S. at 758, 760, 108 S.Ct. at 2144, 2145; *Graff*, 9 F.3d at 1317 (plurality opinion).

At the other extreme, a permit scheme might set out detailed, exclusive, and viewpoint-neutral criteria for an official to follow in deciding whether to grant permits. The scheme might also require the official to give detailed written reasons for each permit decision. If adhered to, such a scheme would diminish the possibility of officials denying permits based on speech viewpoint. *Forsyth County*, 505 U.S. at 131–32, 112 S.Ct. at 2402. Providing detailed guidelines and requiring written reasons would make it easier to detect whether officials' decisions were actually based on unspoken and unconstitutional criteria. *Lakewood*, 486 U.S. at 758, 760, 108 S.Ct. at 2144, 2145.

█ Although more than one way to show that a prior restraint is unconstitutional exists, TJ's argues only "unbridled discretion." Accordingly, the Lowell ordinance will be examined in light of the above principles in order to determine whether, on its face, the ordinance grants the Board and Council excessive and unconstitutional discretion in granting entertainment special exceptions to eating-and-drinking establishments.

The crucial language of the ordinance is that of the special exception standard. That provision can be broken down into three requirements. First, to be granted, a special exception must be "necessary for the public convenience at that location." Second, it must be "designed . . . so that the public health, safety, and welfare" will be protected. Third, the special exception must not cause potential for "injury to the value" of neighborhood property.

These broad terms would allow Lowell officials to consider viewpoint-neutral criteria when evaluating entertainment special exceptions. But their breadth would also allow officials to surreptitiously apply viewpoint-driven criteria. Certainly, from within the expansive concepts of health, safety, welfare, and injury to property values, an official can pull viewpoint-neutral criteria such as potential parking, noise, and litter problems. Still, an official might also stretch those concepts to deny an entertainment special exception on the belief that controversial but protected entertainment might offend the politics or sensibilities of some citizens, thereby cause a protest or other outcry, and in turn threaten the "public welfare" or some other fairly amorphous quality-of-life concept.

More troublesome still is the phrase "necessary for the public convenience." Surely, few uses of property are truly necessary to maintaining public convenience. This would seem particularly true for entertainment. Thus, the "necessary for the public convenience" phrase gives the official a vague and formidable standard to wield in refusing a special exception. One can readily envision an official being faced with a proposal to present entertainment carrying a message the official opposes, and denying the exception under the guise that it is not necessary for public convenience.

The special exception criteria that guide Lowell officials have much in common with those found deficient in *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). In that case, a local ordinance required citizens wishing to hold a parade or demonstration to obtain a permit from government officials. The ordinance directed the officials to grant such a permit "unless in [their] judgment the public welfare, peace, safety, health, decency, good order, morals or convenience require[d] that it be refused." *Id.* at 149–50, 89 S.Ct. at 938. In finding the ordinance to be a facially unconstitutional prior restraint, the Court concluded that "as it was written, [the ordinance] conferred . . . virtually unbridled and absolute power to prohibit" any parade or demonstration. *Id.* at 150, 89 S.Ct. at 938. The Court stressed that in deciding whether to allow an event, the officials were "to be guided only by their own ideas of 'public welfare, peace, safety, health, decency, good order, morals or convenience.'" *Id.*; *cf. Graff*, 9 F.3d at 1317–18 (concluding that

official discretion was sufficiently restrained by a scheme that required officials to "consider[ ] six exclusive criteria by which to grant or deny permission to build a newsstand") (plurality opinion).

Of course, the language in Lowell's ordinance does not track the *Shuttlesworth* ordinance exactly, so some room for textual hairsplitting may exist. Indeed, the Lowell ordinance does not contain terms as expansive and subjective as "decency," "good order," and "morals." Yet the ordinance's "necessary for the public convenience" provision represents an off-setting fault not seen in *Shuttlesworth*. Overall, despite the lack of complete parity of language between the two ordinances, both exhibit an equally amorphous fundamental quality.

Another feature distinguishing *Shuttlesworth* from the case at bar might lie in the difference between a single event such as a public parade and an ongoing variety of entertainment in a tavern. Defendants suggest that the special exception scheme does not give officials a real opportunity to review proposed entertainment for content before deciding whether to allow it. There may be some truth to this suggestion for a business that proposes to continually present a wide range of entertainment. If an eating-and-drinking establishment applies to present an ever-changing variety of bands, disc jockeys, comedians, and other performers several nights a week, Lowell officials might not be able to effectively assess the content of individual performances in advance. However, the ordinance allows officials to grant a special exception for a limited period of time. As such, officials could grant an entertainment special exception for six months, review the viewpoint of entertainment presented, and then revoke the special exception if they object. *See Lakewood,* 486 U.S. at 759–60, 108 S.Ct. at 2145 (noting that an annual renewal requirement for newsrack permits presented a similar danger). In addition, as written, the Lowell ordinance also requires a special exception for an eating-and-drinking establishment to present one perhaps controversial performer on New Year's Eve. Officials could readily assess and censor the content of such a performance.

Discretion is not "unbridled" merely because the limits on it do not represent "perfect clarity and precise guidelines." *Ward,* 491 U.S. at 794, 109 S.Ct. at 2755. Likewise, a remote possibility that an official will engage in viewpoint censorship is likely not enough to invalidate a permit scheme. *Graff,* 9 F.3d at 1317 (plurality opinion). Still, officials must work from "narrowly drawn, reasonable, and definite standards." *Forsyth County,* 505 U.S. at 133, 112 S.Ct. at 2402 (quoting *Niemotko v. Maryland,* 340 U.S. 268, 271, 71 S.Ct. 325, 327, 95 L.Ed. 267 (1951)). Overall, the criteria that guide Lowell officials in considering entertainment special exceptions are constitutionally marginal at best.

Still, the Lowell officials' hands might be forced and effective review made possible by the ordinance's requirement that officials give written reasons when denying special exceptions. Yet nothing dictates what content and level of detail the official must put in the written reason. As with the terminology of the special exception standard, conscientious officials might choose to give detailed written reasons even if not required to do so. Yet officials might also choose to issue vague and terse determinations that hide their true agenda. *See Lakewood,* 486 U.S. at 769–72, 108 S.Ct. at 2150–52 (stressing that "the mayor's statement [denying a newsrack permit] need not be made with any degree of specificity"). Also, although the ordinance explicitly requires the Board to issue written determinations, nothing in the record indicates that the Council is required to issue written reasons for denying a special exception or that it has done so as a matter of course. Defendants have stressed that the Council, not the Board, is the final authority on special exceptions in Lowell. It seems that the final authority need not give written reasons for denying a special exception at all.

The ordinance also allows officials to give with one hand while taking away with the other. A special exception may be granted subject to "conditions and safeguards." With the exception of one obscure reference to off-street parking and loading zones, the record gives no clue as to what conditions and safeguards Defendants have the authority to re-

quire. Under this broad latitude, an official might place conditions on a special exception that are so burdensome that the applicant can derive no real benefit from using it. *See Lakewood,* 486 U.S. at 769, 108 S.Ct. at 2151 (noting that "the mayor could grant the application, but require the newsrack to be placed in an inaccessible location without providing any explanation whatsoever").

Yet another problem is that an applicant cannot easily determine what to put in an application to make it effective. A special exception application must include "such information as may be required" by the Board to determine whether the special exception "will be consistent with the underlying goals and philosophy" of the Lowell ordinance, whether the special exception will "adverse[ly] affect" the "general health, safety, and welfare of" Lowell residents, and whether the special exception "would be authorized by law." The form application supplied by Lowell does not communicate anything more regarding what information is required or will be helpful. The Lowell ordinance lists two dozen or more property uses as special exceptions. From the general directions given, an applicant cannot anticipate with substantial accuracy what information will satisfy the Council and Board for any one of the myriad ways in which a special exception might put property to use.

If the applicant cannot anticipate what to say, the application is less likely to be persuasive. With the applicant thus handicapped, officials can more easily deny a special exception based on viewpoint under the guise of an inadequate showing by the applicant. *See Graff,* 9 F.3d at 1318 (noting that establishing specific criteria to guide officials' decisions allows "the applicant to anticipate the basis for granting or denying a particular permit") (plurality opinion). The applicant is like the pro se litigant, having no idea how the game is played and being at the mercy of those who do. Granted, Defendants suggest that over the course of two or three rejections an applicant might pick up on the game. Yet even if true, this prospect does little to diminish the potential for censorship that,

while not everlasting, is still substantially harmful.

The foregoing list of shortcomings is not meant to suggest that Lowell officials have deliberately set up an unconstitutional censorship mechanism. A facial challenge stresses what might happen over what has happened. A permit scheme that on its face gives officials significant leeway to potentially engage in and conceal censorship is unconstitutional.

Indeed, the shortcomings of the Lowell ordinance may derive largely from the fact that its drafters did not work with the First Amendment in mind. The ordinance applies the same mechanism and standards to all requests for special exceptions, whether the property owner wishes to open a car wash or feature up-and-coming and controversial performers in a tavern. This one-size-fits-all design may pass muster for special exception applications that involve only purely economic concerns. *See Schad,* 452 U.S. at 69–70, 101 S.Ct. at 2183. Yet the same design is too ham-handed to use to evaluate a special exception application seeking to present First Amendment protected speech.

Although Defendants conceivably might have pointed to authorities outside the ordinance to bolster their case, they have not done so. They have not identified any meaningful narrowing construction by state courts or Lowell officials that might have grafted limits onto the ordinance that are not apparent on its face. *See Forsyth County,* 505 U.S. at 131, 112 S.Ct. at 2402 ("In evaluating [a] facial challenge, [a court] must consider the [permitting agency's] authoritative constructions of the ordinance, including its own implementation and interpretation of it."); *Ward,* 491 U.S. at 796, 109 S.Ct. at 2756 (requiring a court entertaining a facial challenge to consider any limiting construction offered by a state court or enforcement agency). True, Defendants have broadly suggested that Lowell officials have no incentive or predisposition to apply the special exception scheme in the unconstitutional ways discussed above, but they have not offered any binding construction of the ordinance that genuinely prohibits officials from doing so.[3]

---

**3.** The Court notes that the Lowell ordinance is a

weighty document, and that Indiana law con-

Defendants have suggested that the possibility of review by certiorari in state court puts a brake on the discretion of Lowell officials. Yet the Court concludes that even if true, this mechanism does not cure the defect of the wide-ranging discretion the ordinance gives Lowell officials. If a permit scheme creates discretion that is "unbridled" at the agency level, the possibility that a court might ultimately reign in agency officials does not save the scheme. *Lakewood,* 486 U.S. at 771, 108 S.Ct. at 2151; *see Graff,* 9 F.3d at 1323 (suggesting that unbridled discretion and adequate judicial review are separate and dispositive requirements of constitutional propriety) (plurality opinion). Indeed, since one of the very dangers created by unbridled discretion is making effective review difficult, looking to judicial review mechanisms to catch and cure unbridled discretion makes little sense.

The amendment adding a definition of "entertainment" did not save the ordinance. Granted, the definition perhaps made it easier for potential applicants to anticipate what officials might consider to be entertainment, and made it harder for officials to use a self-imposed broad definition of the term to further a censorship agenda. Yet because numerous dangers existed in the ordinance as a whole both before and after it defined "entertainment," the slight limiting effect of the definition does not cure the ordinance's overall constitutional shortcomings.

Prior restraints are not unconstitutional per se, but they face a heavy presumption of being unconstitutional. *FW/PBS,* 493 U.S. at 225, 110 S.Ct. at 604. Nothing shows that the Lowell ordinance overcomes this presumption. The Court concludes that the requirement in the Lowell ordinance that an eating-and-drinking establishment obtain a special exception before presenting "entertainment," as defined in the ordinance, is unconstitutional on its face as an impermissible prior restraint on protected speech. To

the extent it seeks to establish this legal conclusion, TJ's Motion is **GRANTED.**

### B. *Time, Place, and Manner Restriction*

Defendants maintain that the Lowell ordinance is a constitutionally acceptable time, place, and manner restriction. TJ's preemptively argues that it is not. Indeed, government restrictions on speech that are not based on speech content, that control when, where, and how speech may be disseminated rather than ban it outright, and that provide reasonable alternative avenues of communication have been upheld under the First Amendment. *E.g., Ward,* 491 U.S. at 791, 803, 109 S.Ct. at 2753, 2760; *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986); *City of Watseka v. Ill. Pub. Action Council,* 796 F.2d 1547, 1553 (7th Cir.1986), *aff'd,* 479 U.S. 1048, 107 S.Ct. 919, 93 L.Ed.2d 972 (1987) (interpreting *Renton* to have applied the full-form time, place, and manner test even though not explicitly stated in the *Renton* opinion).

The first issue raised by this argument is one alluded to above: whether the Lowell ordinance falls under the category of prior restraints or under the category of time, place, and manner restrictions. Disagreement among judges shows that telling the difference may not always be easy. *See, e.g., FW/PBS,* 493 U.S. at 244–45, 110 S.Ct. at 614–15; *Ward,* 491 U.S. at 795 n. 5, 808, 109 S.Ct. at 2756 n. 5, 2763; *Graff,* 9 F.3d at 1334. Yet the Supreme Court has stated that the defining feature of a prior restraint is that it gives the public official "the power to deny the use of a forum in advance of actual expression." *Ward,* 491 U.S. at 795 n. 5, 109 S.Ct. at 2756 n. 5 (quoting *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 553, 95 S.Ct. 1239, 1244, 43 L.Ed.2d 448 (1975)). In other words, a regulation that requires a citizen or business to obtain government permission before disseminating protected speech is a prior restraint. The

tains many statutes and court decisions dealing with local zoning. The Court presumes that if these authorities provided fodder for a narrowing construction argument, Defendants would have found and used it. Defendants have not, and the Court is not obliged to conduct its own

research to be sure that Defendants did not miss something that they could have capitalized on. *See Northwestern Nat'l Ins. Co. v. Baltes,* 15 F.3d 660, 662 (7th Cir.1994) ("District judges are not archeologists.")

Lowell ordinance certainly falls within this paradigm.

■ So the ordinance is a prior restraint, and an unconstitutional one. The next issue, then, is whether Defendants can nonetheless save the ordinance because it passes the time, place, and manner restriction test. This Court thinks not. Cases suggest that once deemed an unconstitutional prior restraint, a permit scheme is simply unconstitutional, and no strong showing under time, place, and manner doctrine can change that. *See Ward,* 491 U.S. at 793, 109 S.Ct. at 2754 (seeming to rule out an unconstitutional prior restraint before proceeding to time, place, and manner analysis); *Graff,* 9 F.3d at 1319, 1323, 1335 (plurality and concurrence suggesting that time, place, and manner appropriateness does not matter if an unconstitutional prior restraint is present); *Stokes v. City of Madison,* 930 F.2d 1163, 1170 (7th Cir.1991) (same).

■ In any event, the Court could not now definitively assess the Lowell ordinance under the time, place, and manner restriction doctrine. The parties have not addressed at all whether a facial challenge will lie in the circumstances here, and the Court's limited resources prevent it from making that perhaps complex inquiry independently. *See Rice v. Nova Biomedical Corp.,* 38 F.3d 909, 917–18 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1964, 131 L.Ed.2d 855 (1995) (suggesting that courts need not develop arguments on behalf of litigants who have not done so); *Hershinow v. Bonamarte,* 735 F.2d 264, 266 (7th Cir.1984) (same). As for any as-applied challenge, genuine issues of fact remain over whether the Lowell ordinance was constitutionally applied to TJ's under the time, place, and manner doctrine.[4]

**C. *Vagueness, Overbreadth, and Under-inclusiveness***

In argument headings and terse assertions, TJ's promises to argue these points but never really delivers. These arguments primarily amount to afterthoughts and conceptual extensions on the prior restraint argument. The Court's resources are ill-used in fleshing out arguments that litigants hint at more than they fully develop. *See Rice,* 38 F.3d at 917–18; *Hershinow,* 735 F.2d at 266. This can be only more true in the complex area of First Amendment law. Accordingly, the Court **DENIES** TJ's Motion on these points.

**D. *General Equal Protection***

TJ's stresses that eating-and-drinking establishments must obtain a special exception to present entertainment while theaters and recreation halls need not. Therefore, TJ's argues, the Lowell ordinance violates equal protection because it "grant[s] the use of a forum while denying that forum to others." (Brief Supp. Mot. p. 19) Yet TJ's argument assumes too much; Defendants have not banned entertainment outright in all eating-and-drinking establishments, they have merely denied TJ's special exception application. Also, TJ's makes no showing that Defendants have granted and denied special exceptions on the basis of speech content. These distinctions are not accounted for in either TJ's arguments or the cases it cites. Of course, substantive due process and equal protection violations of First Amendment rights (or the lack of such violations) often go hand in hand. 3 Ronald D. Rotunda and John E. Nowak, *Treatise on Constitutional Law: Substance and Procedure* § 18.40 (3d ed. 1992); *Mosley,* 408 U.S. at 95, 92 S.Ct. at 2289. But this principle alone does not compel the Court to declare an equal protection

---

4. Moreover, whether Lowell may use the time, place, and manner doctrine at all is perhaps subject to question, given that the speech at issue here (1) would occur on private property as opposed to a public forum, and (2) is not speech in the form of sexually explicit "adult entertainment." *See Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 566, 111 S.Ct. 2456, 2460, 115 L.Ed.2d 504 (1991) (noting that the time, place, and manner doctrine has been primarily used to evaluate restrictions on expression occurring in public

forums, with *Renton* representing at least one exception); *Renton,* 475 U.S. at 49 & n. 2, 106 S.Ct. at 929 & n. 2 (suggesting that the Court elected to apply the time, place, and manner analysis to speech on private property primarily because of the well-documented negative effects adult entertainment can have on a community); *Ward,* 491 U.S. at 804 n. 1, 109 S.Ct. at 2761 n. 1 (suggesting that *Renton* was exceptional in this respect) (dissenting opinion of Marshall, J.).

violation without more focused input from the parties. Accordingly, the Court **DENIES** TJ's Motion on this point.

### E. Arbitrary, Capricious, and Selected Application of the Ordinance

TJ's argues that Defendants acted arbitrarily and capriciously in denying it an entertainment special exception while granting one to Alaskan Pipeline. Because as discussed below Defendants prevail in their summary judgment motion on this point, TJ's Motion is **DENIED** on this point.

TJ's also argues that Defendants have failed to enforce the Lowell ordinance against one other eating-and-drinking establishment and also some adult entertainment establishments in Lowell. TJ's cites no authority and the facts are far from uncontroverted. The Court **DENIES** TJ's Motion on this point.

*Defendants' Summary Judgment Motion*

Defendants assert that they have not violated TJ's procedural due process rights. In its response, TJ's asserts that it is not bringing a procedural due process claim. Accordingly, Defendants' Motion is **GRANTED** on this point.

█ As noted, TJ's argues that Defendants acted arbitrarily and capriciously in denying it an entertainment special exception while granting one to Alaskan Pipeline. Specifically, TJ's asserts that Defendants' actions violated the aspect of substantive due process that generally prohibits irrational decision-making by government officials. Defendants argue that TJ's is wrong.[5] As this Court discussed more fully in its order on Defendants' dismissal motion, at least in the Seventh Circuit, TJ's must pursue its irrational decision substantive due process claim in state court before coming to federal court. *Gamble v. Eau Claire County,* 5 F.3d 285, 288 (7th Cir.1993); *see also River Park, Inc. v. City of Highland Park,* 23 F.3d 164, 167 (7th Cir.1994). TJ's has not done so. Accordingly, on this point Defendants' Motion is **GRANTED**.

Defendants also argue that TJ's cannot show that Defendants have selectively enforced the Lowell ordinance. Neither side has cited any law that would control such a claim. As for what would appear to be the relevant facts, they are in controversy; TJ's has raised, although perhaps just barely, an issue regarding whether Defendants have been acquiescing in violations of its zoning ordinance by businesses other than TJ's. Accordingly, on this point Defendants' Motion is **DENIED**.

The remainder of Defendant's arguments have been foreclosed by the ruling on TJ's Motion above, whether directly or because the arguments are irrelevant in light of the ruling.

*Relief*

TJ's framed its Motion as one for partial summary judgment. In the Motion, TJ's requested all the relief it asked for in its Complaint, except for damages—which leaves declaratory relief, injunctive relief, and attorneys' fees. Ruling on attorneys' fees at this point and with the case in this posture would be premature. As for declaratory and injunctive relief, TJ's has made no showing whatsoever that it is entitled to these specialized forms of relief. This is not to say that TJ's will be unable to make the showing, but merely that it has made no attempt to do so.

Accordingly, TJ's shall have fifteen days from the date of this order to file and serve a brief, supported by relevant authorities, that identifies what relief TJ's seeks and why it is entitled to it. Defendants shall have seven days from being served with this brief to file and serve a response. There shall be no reply.

### CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment is **GRANTED IN PART** and **DENIED IN PART,** Defendants' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART,** and the Motions to Strike are **DENIED**. The parties are **ORDERED**

---

**5.** Curiously, in support of their argument Defendants recite and apply the elements of a proce-

dural due process claim as set forth in *Polenz v. Parrott,* 883 F.2d 551, 555 (7th Cir.1989).

to follow the briefing schedule set forth herein.